In the Matter of Fred A. WARD, Bankrupt.

In the Matter of FRED WARD, Inc., Bankrupt.

Nos. 13941, 13949, 13969.

United States District Court
D. Colorado.
May 4, 1955.

HILLIARD, Referee.

These matters are before the Referee in Bankruptcy on tax claims filed in each proceeding by the United States, the objections thereto interposed by the Trustee, and on the petition of the Trustee for judgment against the United States for tax refunds claimed by him to be due the bankrupt corporation.

The questions presented may be summarized as follows:

1. Did the Commissioner of Internal Revenue erroneously disallow certain deductions claimed by the corporation as business expenses?

2. Is the Trustee entitled to judgment against the United States because of tax refunds sought by him, arising out of worthless securities and bad debt

deductions asserted by the Trustee in amended returns and in claims for refunds which have been rejected by the Commissioner?

3. Were certain amounts received by the individual bankrupt capital gains and dividends, as contended by the Commissioner, or loans as contended by the Trustee?

4. Did the Commissioner erroneously determine that farm losses claimed by the individual bankrupt were not allowable?

Some background material gathered from the facts appearing in the record and adduced at the hearing will contribute to a better understanding of the problems involved. It appears that each of the bankrupts was adjudged such on September 6, 1951, in involuntary proceedings. For some weeks prior to the adjudications the affairs of the corporation had been in the hands of a non-bankruptcy Receiver appointed by the District Court of the City and County of Denver, and that Receiver became Trustee in Bankruptcy of the estate of each of the bankrupts.

The State court proceedings and the subsequent bankruptcies marked the end of a spectacular business career commenced by Ward in Denver in 1941, highlighted by the creation, expansion and collapse of what the Trustee's counsel describe as an automobile empire. First, for some years, Ward was an automobile salesman and a used car dealer, then he became the distributor of Hudson automobiles in Denver and Northern Colorado, and subsequently the distributor for all of Colorado and New Mexico and a part of Nebraska. He erected a pyramid of principal, subsidiary and affiliated corporations. Except for a short period in his early connection with Hudson he was the controlling and principal stockholder of the bankrupt corporation, and completely dominated its policies and activities from then until the end. Study of the entanglements of the affairs of these related corporations with one another and with Ward's personal concerns, the intercompany transactions and transactions between Ward, other officers and employees, the companies, the exchange of checks, and the reconciliation of the resulting accounts, occupied the attention of accountants for many months. The fruits of their labors are among the exhibits offered at the hearing and the chief among them was one of the witnesses produced by the Trustee.

The testimony is that the key to the growth of Ward's business was advertising in nearly every form of that interesting device. His methods partook of the glamorous. He bought a ranch near Broomfield, not far from Denver, with a luxurious and showy residence and landscaped grounds. There, and in his office and show rooms and nearly everywhere else, he entertained customers and prospective customers, dealers and prospective dealers, Hudson officials and representatives; he gave parties at which literally hundreds were present; the guests invited with an eye to their business or their influence in promoting business; he flew customers to the factory to drive their new cars home; he exhibited prize horses duly identified with Hudson and Ward; he bought prize live stock at the National Western Stock show, so that Ward and Hudson would be in the eye of the rancher and stock men and the public generally and in their minds when the purchase of automobiles was to be considered; he took active and very public parts in charitable drives and enterprises. He moved his business into enlarged and elaborate quarters, and over the bar in a room next to his private office, he testified, went many of the thousands of dollars worth of liquor the cost of which the Commissioner has declined to allow as deductions on the corporation's returns. More of this liquor was served to the guests at his ranch parties and quantities of it were distributed as gifts to employees, customers, dealers and company officials. This lavish dispensing of liquor, the publicity-attracting devices, the entertainment, the gifts and the parties, were the cause, he testified, for the truly enormous sales of Hudson cars made by him. For whereas,

in 1941, Hudson sold 265 cars in this area, at the peak of Ward's enterprise there were months when 500 were sold. His gross sales went from $1,364,050.26 in 1947 to $8,966,371.38 in 1949 and the 1950 sales were almost as great. Whereas nationally Hudson was in twelfth place, in terms of units sold, in Ward's territory it was third, exceeded only by Chevrolet and Ford. Other Hudson dealers were entreated by Hudson headquarters to study his methods. Why then did he fail? Because, he testified, his expansion and the momentum of his advertising techniques were arrested and made useless by the impact of Regulation W, the terms of which effectively stifled the sale of automobiles on the installment plan. With the promulgation of this regulation sales fell off, the weaker elements in the corporate pyramid disintegrated, and finally, after intricate manipulations and straw-graspings not necessary to delineate, the whole structure fell, leaving in its ruins the many creditors here represented by the Trustee, the tax claims asserted by the United States and the limitless imponderables which situations of this kind invariably generate.

Questioned by counsel for the United States Ward testified he had been convicted in 1939 in the Colorado courts of forgery, false pretenses, confidence game and conspiracy to commit confidence game; and in 1953 in the Federal courts of mail fraud and conspiracy to commit mail fraud. This evidence was adduced as going to the credibility of Ward, and properly so. The Referee, therefore, gave the closest attention to his testimony, and to his appearance and demeanor on the stand; and has given much thought and study to these things since the hearing. As a result the Referee has come to the conclusion that, whatever Ward may have been or done at other times, his testimony at the hearing now under discussion was entirely credible, clear and convincing, and it has been given weight accordingly. From like observation and study the Referee has concluded that similar weight should be given to the testimony of Iva R. Ward, the bankrupt's wife, although it should be understood as to both of these witnesses that these observations are not blanket endorsements of the conclusions they may have expressed. But they do constitute recognition, so far as their evidence was competent, relevant and material, of its truthfulness and persuasiveness.

The Commissioner, in determining deficiencies of income and excess profits taxes against the corporation for the years 1946 through 1950, disallowed amounts claimed as deductions for expense. They relate largely to expenses claimed for the purchase of liquor and that point only will be discussed in this opinion, although it is to be understood the same conclusions as to deductibility have been reached with respect to the other disputed items. In proof of the tax liability asserted the government offered a duly certified copy of the Commissioner's assessment and rested its case. This raised a presumption of law that the tax was legally due and owing and shifted the burden to the Trustee. A. & A. Tool & Supply Co. v. Commissioner, 10 Cir., 182 F.2d 300. The Trustee sought to sustain this burden by offering the testimony of a certified public accountant, and by the testimony of the bankrupt and his wife, and the Referee has accorded the testimony of the two latter the weight above mentioned. Counsel for the government criticise Ward's testimony with respect to the claimed liquor expense on the ground he did not name the persons who drank the liquor and when and where, but the company's books recorded the purchases and charged them to expense, and Ward outlined in satisfactory detail the classes of persons who consumed it and the purposes for which it was given them. He was definite in asserting the liquor was purchased and used to promote the sale of automobiles and the amounts claimed as deductions bear a reasonable relation to the sales, for as between liquor expense and sales we find these proportions:  1947, $2514.76, $1,364,050.26;

1948, $2310.16, $1,682,216.19; 1949, $4043.37, $8,966,371.38; 1950, $3780.35, $8,405,601.13. He testified it was the custom of the trade to give liquor to and buy drinks for customers, prospective customers, subordinate dealers and employees, and factory representatives, and that its use in those ways constituted an ordinary and necessary expense of doing business. There is nothing in the record to dispute him in this or in any other regard. It follows, therefore, that the Referee is obliged to find and he does find that the expense deductions for liquor were ordinary and necessary expenses within the meaning of Section 23(a) (1) of the Internal Revenue Code, 26 U.S.C.A., and that the deficiencies asserted on account of the disallowance of these deductions were erroneous. Wilson v. Eisner, 2 Cir., 282 F. 38; A. & A. Tool & Supply Co. v. Commissioner, supra.

After the appointment of the Trustee and examination of the books and records of the company, the Trustee filed amended returns for the company and included deductions not theretofor claimed on account of worthless securities and bad debts. Among the bad debts set up were large sums shown on the corporation's books as due from the individual bankrupt. The effect of these claims for worthless securities and bad debts was to wipe out the tax liability set forth in the original returns and which had been discharged by payment when those returns were filed. Consequently the Trustee filed claims for refund covering the fiscal years 1947, 1948 and 1949, seeking to take advantage of the carry-back provisions of Section 122, Internal Revenue Code, in an aggregate amount, exclusive of interest, of $92,-530.51. These claims were denied by the Commissioner on March 13, 1953, and are the subject of the Trustee's petition for judgment against the United States in their sum.

The evidence in support of the Trustee's assertion there were worthless securities and bad debts in the amounts set forth in the amended returns and in the claims for refunds was given by the individual bankrupt and by the certified public accountant under whose supervision the books and accounts of the corporation had been examined after the commencement of the State court proceedings. The Trustee abundantly established the qualifications of the latter witness and counsel for the government, at the hearing and in the briefs, attest to his ability and integrity. He testified unequivocally that from his examination of the books and records of the corporation, its affiliated and subordinate companies, and from corroborating data sought and obtained, the debts were bad because they represented true accounts receivable, and the securities had become worthless, and identifiable events demonstrated these facts. His conclusions that the identifiable events had occurred were, with respect to some of the items, substantiated by the testimony of one of the Trustee's attorneys who told of his vain efforts to collect them. The accountant said that good accounting practice and methods had been followed in his ascertainments and that it was proper and in accordance with applicable internal revenue law and regulations to apply the bad debts and worthless securities as had been done in the amended returns and claims for refund.

Now, in substance, all of the accountant's testimony with respect to these things was opinion evidence, and the question is posed whether it is sufficient, if it is that degree substantial, to overcome the presumption of law which attends the findings of the Commissioner in denying the claims for refund. It is the conclusion of the Referee that the evidence is sufficient and that it shifted the burden to the United States, a burden no effort to meet was made. Indeed, we are confronted actually by two conflicting opinions, for it must be assumed that in the opinion of the Commissioner the claims for refund were without foundation, and, as we have seen, there is a presumption of law that his determination was correct. But, as we have also seen, when substantial evidence appears to re-

fute the Commissioner's determination, then the presumption disappears and the trier of the facts is bound to give effect to the contrary evidence if it be substantial. The weight and effect to be given opinion evidence turns upon many factors. Here, it seems to the Referee, the established and conceded competency and the recognized integrity of the testifying accountant are of the greatest significance. For, where the opinions of a qualified witness are founded upon facts within his knowledge and experience, and supported by good reasons, his testimony is entitled to credence. Certainly it has more weight than pure speculation or theory and, in the absence of any evidence to the contrary, it cannot be said that the Commissioner's views had any firmer foundation. Cf. Bene v. Jeantet, 129 U.S. 683, 688, 9 S.Ct. 428, 32 L.Ed. 803; Tracy v. Commissioner, 6 Cir., 53 F.2d 575, 577. Consequently, upon that testimony, that of the attorney, and that next discussed, it is the conclusion of the Referee that the Trustee is entitled to judgment against the United States for the amount of the claims for refund with appropriate interest.

At this point it should be said that at the hearing counsel for the government objected to the jurisdiction of the Bankruptcy Court to hear and decide the petition of the Trustee for judgment against the United States, and leave was given to argue the point in the briefs. The point is not raised or discussed in the briefs and hence the Referee has assumed that jurisdiction has been conceded.

■ The individual bankrupt testified the amounts listed on the corporation's books as debts due from him were loans to him for many and varying purposes, some for personal matters, and others for business purposes and involved in the intricate corporate structure and manipulative devices mentioned above. Trustee's Exhibit 9 is a photostatic reproduction of the ledger sheets of this account and Exhibit 10 is an analysis of its debits and credits. The account commenced March 31, 1948, when the individual loaned the corporation some $50,000.00

and thus created a credit balance in his favor. The account was active through all of its life extending to July 31, 1951, and for the period ended October 31, 1948, had a credit balance at all times. Thereafter until the account terminated there was always a debit balance but throughout the period frequent and substantial payments and credits appear, and these aggregate nearly one-half the sum of the amounts advanced. The account is reflected in the annual report filed by the corporation in the office of Colorado's Secretary of State under Section 80, Ch. 41, 1935 C.S.A., and certified copies of these reports are in evidence. In short, in the view of the Referee, based on the testimony of the accountant and the individual bankrupt, examination of the account itself, and the annual reports, the account is of loans to and from the corporation on the part of the individual and cannot properly be treated as dividends or capital gains. If these withdrawals were disguised dividends why were repayments made in large amounts and on frequent but irregular occasions, and why an active in and out account? The conclusion is inescapable that the account was truly a loan account and there is nothing to dispute the individual bankrupt's testimony that he was obliged to and intended to repay the account, or to offset his stated belief he would have repaid it had it not been for the strangling effect of Regulation W.

■ The question of whether payment out of moneys of a corporation creates accounts receivable or should be treated as dividends or capital gains is always one of fact, to be determined by the trier of the facts, and nearly all of the numerous cases cited in the briefs make reference to this principle. The government stresses the line of cases in which the facts, which are here present, establishing lack of minutes authorizing the claimed loans, the absence of notes, and the failure to pay or charge interest, are held to show the payments were dividends. But the presence of these facts is not necessarily conclusive any more than the absence of minutes, here the

case, authorizing a dividend conclusively demonstrates the payments are not dividends. The ultimate questions are, was there an intent to repay and was there an obligation to repay, and in the case at bar the undisputed evidence, clear, credible and convincing, establishes that both of these elements were present. These findings necessarily preclude a theory of dividends or capital gains, and necessarily establish that the balance of the account constituted a bad debt properly deducted by the Trustee in the amended returns, and necessarily negative the Commissioner's assessment of income tax against the individual on the ground he had received dividends and capital gains rather than the proceeds of loans. Upon the evidence, the record and the law the Referee has no hesitation in determining, and he does determine, that the Commissioner erroneously disallowed the account of Fred Ward as a bad debt, and erroneously determined that the loans were dividends and capital gains and taxable to the individual as a part of his income. Cf. H. C. Thorman v. Commissioner, 20 T.C. 1113, Docket Nos. 31431 and 31432, promulgated August 27, 1953.

█ Did the Commissioner erroneously determine that farm losses claimed by the individual in his tax returns were not allowable? Here again, of course, a question of fact must be resolved and again the burden is upon the Trustee to overcome the presumption of law favoring the Commissioner's determination.

The government contends very earnestly that Ward's ranch was a show place and a hobby and, under the law pronounced in many decisions in such cases, losses in its operation are not to be considered in determining tax liability.

The evidence of Ward and his wife is undisputed that they had engaged in farming operations for several years prior to the tax years here involved. About 1941 they moved to a 12 acre tract on South Jackson Street, near Denver, and there raised hogs, cattle and poultry for sale and profit, and leased additional land which they devoted to those purposes. A year later they removed to a four acre tract on South Colorado Boulevard and there, and on additional land, they raised stock and poultry for sale and profit. For a time during this period they owned a restaurant on East Colfax Avenue and many hundreds of the chickens raised by them they dressed and served in that establishment. At times the operations showed a profit and both testified their intention always was to raise the crops, animals and poultry for sale and profit. When what they fancied were bright days came they moved to the ranch at Broomfield and there continued the same pattern and extended their operations to include the breeding, raising, showing and sale of show horses. Barns and sheds were built and a show ring laid out. Additional land was procured for a lake for irrigation purposes to insure hay crops for the animals and crops generally. A herd of 100 or more blooded Angus cattle was acquired. A systematic plan of expanding the operations and improving the land was adopted and pursued. Mrs. Ward had practically complete charge of the farming operations, devoting a great deal of her time to them, and separate accounts and bank accounts with respect to them were maintained.

It is true, of course, that in none of the tax years involved did the farming operations show a profit, but that is consistent with the plans of expansion, growth and experimentation testified by the Wards to have been in their minds. It cannot be said with certainty that their plans would not have materialized and made the enterprise financially successful. Cf. Plant v. Walsh, D.C.Conn., 280 F. 722. Nor is it inconsistent with the history of their earlier farming operations, undoubtedly entered into for profit, that they should—in what they thought were better and bigger days— continue their operations on a larger and yet larger scale and reasonably expect to profit financially therefrom.

The government asserts that the losses of the ranch during the tax years in ques-

tion—1948, 1949 and 1950—amounted to $283,842.50 and receipts to only $37,402.-37, and argue from this premise that the receipts and expenditures rule pronounced in Thacher v. Lowe, D.C.N.Y., 288 F. 994, should be applied. The government's position is factually unsound for the $283,842.50 includes capital expenditures and loans. The tax returns for these years—and they are the common basis of the claim for deductions on the part of Ward and of the disallowance made by the Commissioner—show that during the whole period of the returns the gross receipts from sales of livestock bought or raised and sale of produce was $39,783.76, and the losses claimed, including depreciation of $9605.70, totalled $63,449.21. It should be added that depreciation was not claimed on the residence buildings but only on those used in connection with the farming operations.

Were it not for the history of the farming operations of the family it might be concluded the doctrine of the Thacher case was applicable, but when that history is considered, effect given to the testimony of Mr. and Mrs. Ward as to their intent, and the fact that the years involved were those of development and experimentation being carried on by the Wards in the belief their losses would be offset when their plans and system had come to fruition and profits be made, it is entirely clear the operations were entered into with the purpose of making a profit. That a loss occurred does not of itself exclude the operations from the classification of a business within Section 23 of the Internal Revenue Code, as amended. Plant v. Walsh, supra. The question always to be determined is, did the activity of the taxpayer constitute the carrying on of a trade or business; for if it did the ordinary and necessary expenses involved are deductible. Morton v. Commissioner, 2 Cir., 174 F.2d 302. And while the expenses in the case at bar

seem high when viewed in the light of the income for the years in question, they are not high when considered in connection with the plans and aims the Wards had in mind for the future years they anticipated they would have on the ranch. Their testimony was straightforward and reasonable and is entitled to credence, and it is undisputed. It is supported by the circumstances, and it would be arbitrary to overlook their testimony and those circumstances, and sustain the government which rested its case solely on the presumption of law in favor of the Commissioner's assessment. A. & A. Tool & Supply Co. v. Commissioner, supra; Tatt v. Commissioner, 5 Cir., 166 F. 2d 697; Wilson v. Eisner, supra.

In the final analysis the question here is one of burden of proof. The government offered no witnesses; it depended entirely and alone upon its assessment and the presumption arising therefrom. The Revenue Agent who supervised the preparation of the reports upon which the assessments were based attended the hearing and, testifying at the request of the Referee and not at that of the government, gave evidence that one of the officers of the company had given him information which varied from Ward's testimony. This officer was in the court room, under subpoena of the government, but he was not called to the stand. In sum, the government has no case other than the presumption of its assessment.

All of the testimony adduced by the Trustee considered, the credibility of the witnesses given the weight and effect above stated, and the dependence of the government upon its presumption alone, leads to no other conclusion than that the Trustee has fully sustained the burden imposed upon him. While the Trustee argues that the burden is less onerous than that maintained by the government to apply, there is no occasion critically to examine the cases cited by the Government.[1] The Trustee has met

---

1. Guarantee Bond & Mortgage Co. v. Commissioner, 6 Cir., 44 F.2d 297; Matern v. Commissioner, 9 Cir., 61 F.2d 663; Lightsey v. Commissioner, 4 Cir., 63 F.2d 254; Merchants Transfer & Storage Co. v. Burnet, 4 Cir., 49 F.2d 56; Wright v. Commissioner, 4 Cir., 50 F.2d 727; Roybark v. U. S., D.C.Cal., 104 F.Supp. 759.

the burden which the government says those cases impose and certainly the burden is no greater. He has established by substantial, clear and convincing evidence that the findings of the Commissioner were erroneous and resulted in illegal exactions; by like evidence he has established that the Commissioner erred in denying the claims for refund; and he has similarly shown what the proper determinations should have been. Cf. Alexander v. Theleman, 10 Cir., 69 F.2d 610.

The contentions of the Trustee must be sustained and findings of fact and conclusions of law accordingly will be entered.

### Supplemental Opinion

HILLIARD, Referee.

Pursuant to the order of the Referee of May 8, 1954, counsel for the Trustee have submitted a proposed decree. The United States has filed objections to the proposed decree which amount in effect to and will be considered as a petition for reconsideration of the finding and order that the United States is indebted to the Trustee in the sum of $92,530.51. The importance of the issue warrants further examination of the facts and law involved.

As was pointed out in the Referee's opinion filed on May 8, 1954, the question of the jurisdiction of the Referee to entertain the Trustee's demand for a refund was suggested by the United States at the hearing. The record discloses that the tax claims filed by the United States as unsecured claims were objected to by the Trustee on the ground that a proper redetermination of the taxes for the years in question, in accordance with the amended returns filed by the Trustee, would show that losses occurred in those years in such amount as not only to require a determination that there was no tax liability but that the taxes paid by the bankrupt for those years should be refunded. Formally the objection took the form of a set off claimed by the Trustee against the tax claims, although in the opinion of May 8, 1954, the expres-

sion is used that the Trustee had petitioned for a judgment against the United States. In light of the principles involved it is important that more exact phraseology be employed and this opinion will endeavor to do so.

In the opinion referred to it is said, with respect to the government's position as to jurisdiction, that ". . . at the hearing counsel for the government objected to the jurisdiction of the Bankruptcy Court to hear and decide the petition of the Trustee for judgment against the United States, and leave was given to argue the point in the briefs. The point is not raised or discussed in the briefs and hence the Referee has assumed that jurisdiction has been conceded." The government now contends that its sovereign immunity from suit without its consent cannot be waived, that particularly it cannot be waived by an officer as was the effect of the holding that it had consented in this proceeding, and that there is no statute permitting a judgment against it in this proceeding, citing United States v. Eckford, 6 Wall 484, 73 U.S. 484, 18 L.Ed. 920, and United ed States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888. These contentions impel the Referee to state his opinion as to the interpretation to be given the Bankruptcy Act under the facts here appearing and the burdens which the United States assumes when it becomes a claimant in the Bankruptcy Court under such circumstances.

Formerly the Bankruptcy Act did not require the United States to file claims for taxes asserted to be due it but, in substance, made it the duty of the Trustee to pay any taxes which appeared to be due. The present Act, except as it awards a status of priority, puts the United States in no better position than any other claimant. The government is within the definition of a "creditor" and must file a claim in the same manner and form as other creditors, and taxes due it are provable claims. Section 1(11), 1 (14), 57, sub. n, 64, sub. a(4), Bankruptcy Act, 11 U.S.C.A. §§ 1(11, 14), 93, sub. n, 104, sub. a(4); In re Mercury

Engineering, Inc., D.C., 68 F.Supp. 376; United States v. Bernstein, 8 Cir., 16 F.2d 233; Remington on Bankruptcy (4th Ed.) Secs. 697, 760.

Section 23, sub. b of the Bankruptcy Act, dealing with the summary jurisdiction of the Bankruptcy Court, provides that "Suits by the * * * trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under this Act had not been instituted, unless by consent of the defendant * * *." It is the opinion of the Referee that this section is as applicable to the United States as it would be to any other unsecured claimant who has filed a claim in the proceeding, for there is nothing in the Act, excepting the priority of payment mentioned, to indicate that the government is to be accorded any rights or privileges denied to other creditors. Indeed, it seems clear that the present Act was intended, based on its purpose—often expressed—of equality of treatment of creditors, to give the United States no greater or less rights (the right of priority again excluded) than any others who have claims against a bankrupt's estate. Thus viewed it must be held that it was the intention of Congress to waive the immunity of the United States from suit in matters arising out of the participation of the United States as a claimant in bankruptcy proceedings. Otherwise stated, Congress by the terms of the Bankruptcy Act has conferred jurisdiction on the Bankruptcy Court to entertain suits against the United States as it may against any other creditor. Cf. United States v. Shaw, supra, 309 U.S. 500–501, 60 S.Ct. 661. If this were not so the government would be in a position to "reach out with Briarean arms to gather the benefits * * *; and then draw back under the protection of its sovereign immunity, even while an accounting upon its claim before the Referee in bankruptcy is in progress."

Under the provisions of Section 68, sub. a of the Bankruptcy Act a set off may be interposed against a claim, and "the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid." This section has been the subject of many decisions, and the substance of them is that one who files an unsecured claim is subject to judgment against him if the Trustee establishes that the claimant is in fact indebted to the bankrupt. A leading case is Florance v. Kresge, 4 Cir., 93 F.2d 784, followed in Columbia Foundry Co. v. Lochner, 4 Cir., 179 F.2d 630, 14 A.L.R.2d 1349. The case at bar comes squarely within the doctrine of those decisions. Cf. Alexander v. Hillman, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192; 4 Collier on Bankruptcy (14th Ed.), Section 68:20; 2 Collier (op. cit.), Section 23:08. There is true mutuality and the set off was pleaded as required by General Order 37, 11 U.S.C.A. following § 53, and R.C.P. 13(a), 28 U.S.C.A. United States v. Roth, 2 Cir., 164 F.2d 575; In re House of Gus Holder, Inc., D. C., 91 F.Supp. 841.

It remains to be ascertained whether summary jurisdiction existed to grant the judgment against the United States. As was pointed out above the Referee assumed that the United States had consented to the jurisdiction, but this is now disputed. The facts are that at the hearing counsel for the government suggested the point and, after colloquy of counsel, it was agreed and the Referee ordered that the matter should be argued in the briefs and determination be thereafter made. In its brief the government ignored the issue and confined its argument to the merits. It was not until after the Referee had made his findings and order, leaving nothing to be done but settlement of the decree, that the government asserted a lack of jurisdiction. This came too late. Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155, 89 L. Ed. 97; Page v. Arkansas Gas Corp., 286 U.S. 269, 52 S.Ct. 507, 76 L.Ed. 1096; In re Pinsky-Lapin & Co., 2 Cir., 98 F.2d 776; In re Read-York, Inc., 7 Cir., 152 F.2d 313; Honeyman v. Hughes, 9 Cir.,

156 F.2d 27. It follows, therefore, that the United States could consent to the summary jurisdiction of the Referee and that by its conduct it waived any right of objection.

It is also to be considered that the Trustee could have maintained an action for the refund in either the District Court of the United States or in the United States Court of Claims. 28 U.S.C.A. § 1346(a) (1); Section 23, sub. a, Bankruptcy Act. The right of the Trustee and the United States to have had the issue determined in a plenary action is certain. It is equally certain that, consent having been given as permitted by Section 23, sub. b of the Bankruptcy Act, the Bankruptcy Court could summarily adjudge the dispute. In this connection attention is focussed again on Florance v. Kresge, supra, for it was there determined that the filing of an unsecured claim in itself amounts to a consent to the summary determination of a set off and, if the striking of balances warrants, the awarding of a judgment against the claimant and in favor of the Trustee, as contemplated by Section 68, sub. a of the Bankruptcy Act. See also Alexander v. Hillman, supra; 4 Collier (op. cit.), Sec. 68:20; 2 Collier (op. cit.), Sec. 23:-08; McDonald v. Plymouth County Trust Co., 286 U.S. 263, 52 S.Ct. 505, 76 L.Ed. 1093; Cline v. Kaplan, supra.

For the reasons stated it is the opinion of the Referee that the Bankruptcy Court had summary jurisdiction to hear and determine the set off and to enter judgment against the United States for the refund, and that the United States consented to such jurisdiction both by the filing of its unsecured claims and by waiver of any right of objection. Accordingly the petition of the United States for reconsideration will be denied.

Nothing else appeared in the objections to the proposed decree or was suggested in argument to alter the views heretofore expressed by the Referee. Therefore, the orders made on May 8, 1954, will be confirmed in their entirety.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe and Charles Mehaffy, Sp. Assts. to Atty. Gen., Donald E. Kelley, U. S. Atty., Denver, Colo., and Clifford C. Chittim, Asst. U. S. Atty., Boulder, Colo., for the United States of America.

Benjamin F. Stapleton, Jr., and Bart W. O'Hara, Denver, Colo., for Albert J. Gould, trustee in bankruptcy.

Order

KNOUS, Chief Judge.

This matter is before the Court on the Petition of the United States for review of the Order, Judgment and Decree entered by the Referee in Bankruptcy in the above entitled proceedings on the twenty-third day of August, 1954.

From my study of the record and a consideration of the arguments of counsel and the briefs thereafter submitted at my request, I am satisfied that the disposition made by the Referee in the matters under review must be upheld.

Following the hearings before him, the Referee fully detailed the factual situation and the basis of his decision in an original and a supplemental opinion which appear in the record and which are reported at length beginning at page 50 in the April, 1955 issue of the Journal of the National Association of Referees in Bankruptcy, in view of which I deem it unnecessary to prepare a further opinion in the matter. Accordingly, it is

Ordered and adjudged that the Order, Judgment and Decree of the Referee in Bankruptcy under review be, and the same is hereby affirmed.