**ALTERMAN FOODS, INC.**

v.

**The UNITED STATES.**

No. 50–76.

United States Court of Claims.

Dec. 12, 1979.

Timothy R. Askew, Jr., Atlanta, Ga., for plaintiff, Cleburne E. Gregory, Jr., Atlanta, Ga., attorney of record. Arnall, Golden & Gregory and Cleburne E. Gregory, III, Atlanta, Ga., of counsel.

Robert N. Dorosin, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions, to the recommended decision of Trial Judge David Schwartz, filed January 29, 1979, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel.

The court recognizes that under I.R.C. section 316 a corporation must have sufficient earnings and profits before a constructive dividend can be found to exist; retained earnings are considered in this opinion solely to analyze plaintiff's intent. Since the burden is on the plaintiff to disprove the Commissioner of Internal Reve-

nue's determination (*E. I. DuPont De Nemours and Co. v. United States*, Ct.Cl., 608 F.2d 445 (1979), and since plaintiff did not allege an insufficiency of earnings and profits, we are satisfied sufficient earnings and profits were available to constitute constructive dividends in the amounts found by the trial judge.

Upon consideration of the trial judge's decision, the briefs and oral argument of counsel, and the above paragraph inserted by the court, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, as set forth in the following conclusion of law, plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge:

This is a suit for refund of income taxes. The question, familiar in the law of tax liabilities of stockholders in controlled corporations, is whether advances by corporate subsidiaries to their sole stockholder, the plaintiff-taxpayer, were loans to the taxpayer, as alleged by it, or constructive dividends and thus taxable income, as maintained by the Commissioner.

In 1966–74, plaintiff Alterman Foods, Inc., owned all the stock of some 57 subsidiaries engaged in the operation of a chain of retail grocery supermarkets in the Atlanta area. The markets grew in the years involved from 59 in 1965 to 95 in 1974.

Each subsidiary signed a management agreement, under which the plaintiff sold to it, at cost, merchandise, fixtures, remodeling and construction and insurance. All other needed services—warehousing, advertising, management and supervision, legal, accounting and office services and supplies, as well as licenses for the use of store and product tradenames—were provided for a fee of 2½ percent of gross sales. In addition, and this provision is the source of the

present case, the subsidiaries were required to advance to the plaintiff their gross receipts, from which the plaintiff would pay itself the amounts due for merchandise, repairs and the other services provided.

Accounts of the advances and expenditures were kept by both parent and subsidiary. The balances fluctuated on a periodic and annual basis as advances were received by the parent and expenditures made by it and debited against the advances. The net advances, *i. e.*, the excess of advances by the subsidiary over expenditures by plaintiff on behalf of the subsidiary, were in plaintiff's financial and tax returns treated as accounts payable, under liabilities, and in the books of the subsidiary as accounts receivable, under assets.

Not all subsidiaries in all the tax years added to their net advances. Advances might decline as against expenditures by the parent, resulting in a decrease in the year-end balance of net advances or even a reversal from a balance of net advances to one in which plaintiff's expenditures on behalf of the subsidiary exceeded the advances. This occurred in years in which a subsidiary was operating an unprofitable market, in years in which plaintiff made substantial capital expenditures for remodeling of a market, or in years of both such characteristics.

Nevertheless, the aggregate of net advances from all subsidiaries grew as the years continued to be profitable in the overall. In the tax years 1966–74, the aggregate retained earnings of the 57 subsidiaries steadily increased by $12.1 million from $6.5 million at the end of 1965 to $18.6 million at the end of 1974. Paralleling this increase, the aggregate balance of net advances grew from $1.6 million at the end of 1965 to $6.5 million in 1970 and 1971 and then declined to $5.8 million in 1972–74.

In computing the amounts of advances to be taxed as dividends, the Commissioner did not aggregate all advances by the subsidiaries as against all expenditures by the

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his decision, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

plaintiff, and then tax as dividends the net balance. He treated each subsidiary as a separate entity and, generally speaking, assessed deficiencies to the extent of the increase in a tax year of the net advances by a subsidiary to the plaintiff. He did not, however, assess a deficiency in cases of advances in a year which merely reduced the prior year's excess of expenditures over advances. He treated as a constructive dividend only an increase from a beginning annual balance of net advances to a greater year-end such balance. And where the beginning balance showed an excess of expenditures over advances, the Commissioner treated as a constructive dividend only the increase from a zero balance to the year-end balance of net advances. The annual increases in net advances thus treated by the Commissioner as constructive dividends was $9.4 million.

The same case was presented as is here presented and the same contentions were made in plaintiff's suit for a refund with respect to the tax year 1965, the year immediately preceding the years now in suit. In that case, the Court of Appeals for the Fifth Circuit affirmed the action of the district court in setting aside a verdict for the plaintiff and entering judgment for the Government. *Alterman Foods, Inc. v. United States,* 505 F.2d 873 (5th Cir. 1974). The plaintiff here contends that factual differences distinguish the present case from that for the year 1965. On examination, the differences seem inconsequential; the cases are essentially the same. The decision by the Fifth Circuit is both persuasive and confirmatory of the decision made on the record here.

■ The inquiry whether corporate funds have passed to a shareholder as bona fide loans, creating a creditor-debtor relationship, depends on whether the parties definitely intended that the sums advanced would be repaid. *Alterman Foods, Inc. v. United States, supra,* 505 F.2d 873, 875–76 (5th Cir. 1974); *Chism's Estate v. Commissioner,* 322 F.2d 956, 959–60 (9th Cir. 1963); *Clark v. Commissioner,* 266 F.2d 698, 710–11 (9th Cir. 1959).

■ Intent is to be determined on consideration of all the circumstances. These include, the Fifth Circuit noted, the extent to which the shareholder controls the corporation; the earnings and dividend history of the corporation; the magnitude of the advances; and presence or absence of conventional indicia of debt such as the giving of a note or security, a maturity date, a ceiling on the advances and effort and ability to repay or to require repayment. 505 F.2d at 877, n. 7.

To these factors might be added the treatment of the advances in corporate financial statements and tax returns; whether interest was charged or paid on the balances; and in some instances, the use to which the shareholder put the advances. Rabkin & Johnson, 2 *Federal Income, Gift and Estate Taxation,* § 21.05(6) (1978). No single factor is, of course, determinative. Together all the factors may convey whether repayment or indefinite retention was intended. *Koufman v. Commissioner,* 35 TCM (CCH) 1509, 1523 (1976); *Livernois Trust v. Commissioner,* 433 F.2d 879, 882 (6th Cir. 1970); *Dynamics Corp. of America v. United States,* 183 Ct.Cl. 101, 110, 392 F.2d 241, 247 (1968); see Note, *Stockholder Withdrawals—Loans or Dividends?,* 10 Tax L.Rev. 569 (1954–55).

The setting and the controlling relationships are perhaps the first circumstance to be considered. All the factors must be assessed in the context, here, of the 100 percent ownership by the shareholder of the stock of the subsidiaries. Members of the founding family were the owners of approximately 50 percent of the stock of the parent and were also the directors and officers of both the parent and subsidiaries.

■ No doubt an advance by corporation to a controlling shareholder can constitute a loan, as in *Nasser v. United States,* 257 F.Supp. 443 (N.D.Cal.1966) and *Shaken v. Commissioner,* 21 T.C. 785 (1954). But a relationship between shareholder and corporation of total control and identity of interest creates obvious difficulties to thinking of the shareholder and corporation as debt-

or and creditor. A withdrawal of corporate funds may be used as a means of giving a controlling stockholder permanent use of the funds, in effect a dividend, without payment of the tax due on payment of a dividend. The possible tax evasion motive invites most careful scrutiny. *Electric & Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1339 (1971), *aff'd*, 496 F.2d 876 (5th Cir. 1974).

The advances here came about under the rigorous discipline of a management contract between parent and each subsidiary which dated from the creation of the subsidiary. The general terms of the contract are noted above. The clause productive of the present case provided that the subsidiary would "advance to us [plaintiff] from time to time, upon our request, such funds as we may require, which will be credited to your [the subsidiary's] account. Accountings shall be made and had between us from time to time, at such times as we may mutually agree upon." Apparently the funds "required" to be advanced were all the funds available. In practice what happened was that managers of the out-of-town stores deposited gross receipts, less cash needed for local purchases and cashing of customer's checks, in bank accounts from which they could not make withdrawals, and on a biweekly basis the balances were transferred to the parent's bank account in Atlanta. The transferring check was signed by one of the three brothers who were the officers of each subsidiary and of the parent.

Advances by the Atlanta stores were made more directly. The receipts of these stores were picked up daily and deposited in the parent's bank account. The parent thereafter deducted the charges to the subsidiaries, and kept and used as it wished the excess—the net advances.

Plaintiff points to the terms of the management agreement and to the consistent treatment of year-end balances as accounts payable or receivable as evidence of a bona fide debtor-creditor relationship and an intent on the part of the creditor to repay the advances in the future. The terms of the agreement, however, neither characterize the balance in the intercompany account as a loan or debt or specify any repayment schedule or time for settlement of an outstanding balance. The vague reference to accountings "between us from time to time, at such times as we may mutually agree upon" is insufficient either to give the putative creditor the right to demand repayment of an outstanding balance or to show an intent on the part of the parent to repay. Actually, accountings never took place. The management contract thus gives little weight to plaintiff's argument that repayment was intended.

The consistent treatment of year-end balances as accounts payable, in the plaintiff's financial statements and annual reports and in tax returns, provides some small support for plaintiff's position. Creditors and bankers rely on financials. *See Sharp v. Commissioner*, 12 TCM (CCH) 836, 842 (1953). But the cases are frequent in which treatment as loans on the books of the taxpayer is held unavailable to forestall the contrary conclusion. *Regensburg v. Commissioner*, 144 F.2d 41, 44 (2d Cir. 1944), *cert. denied*, 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625 (1944); *Electric & Neon, Inc., supra*, 56 T.C. at 1329, 1339–40; *Roschuni v. Commissioner*, 29 T.C. 1193, 1203 (1958) *aff'd*, 271 F.2d 267 (5th Cir. 1959), *cert. denied*, 362 U.S. 988, 80 S.Ct. 1074, 4 L.Ed.2d 1021 (1960). The Fifth Circuit in its decision on the same issue for this plaintiff's 1965 tax year denied the plaintiff's tax returns and financial reports status as "objective economic indicia of debt," dismissing them as "little more than additional declarations of intent." 505 F.2d at 879. In a case of complete identity between corporation and stockholder the books are a self-serving arrangement by the taxpayer calling for scrutiny for possible evasion of taxes. The court of appeals was of the view—here shared—that the careful scrutiny appropriate in such cases required emphasis on the objective indicia of plaintiff's intent rather than on the formal statements of that intent on the books of the plaintiff.

One of these indicia may be the payment or nonpayment of formal dividends. Nonpayment of formal dividends may be strong evidence that concurrent advances to stockholders are disguised dividends. *Koufman v. Commissioner, supra.* Here the subsidiaries, entirely apart from the advances under consideration, paid formal dividends to a total of $4,508,485 during the years in question. While these are substantial sums, they are inconclusive as showing that the additional sums advanced were not also dividends, in view of the relative size of those advances and particularly the very substantial and growing retained earnings of the subsidiaries—$18.6 million by the last of the tax years. The pattern suggests that more than the $4.5 million paid as dividends was available to be paid as dividends, and that the advances were actually disguised dividends. Or, at least, doubts are created— doubts fatal to a taxpayer seeking to overturn a deficiency assessment. The increases in advances, formal dividends paid by the subsidiaries and their retained earnings were as follows:

| Tax Years | Increases in Advances Taxed as Dividends | Formal Dividends | Retained Earnings |
|---|---|---|---|
| 1966 | 884,139.27 | 647,400 | 6,546,967 |
| 1967 | 1,281,150.99 | 479,300 | 8,108,114 |
| 1968 | 1,388,841.99 | 640,535 | 9,515,650 |
| 1969 | 968,772.82 | 666,750 | 10,707,826 |
| 1970 | 1,333,227.00 | 685,500 | 11,922,157 |
| 1971 | 498,031.00 | 685,250 | 13,148,979 |
| 1972 | 597,479.00 | 703,750 | 14,360,352 |
| 1973 | 1,418,745.35 | none | 16,597,817 |
| 1974 | 982,683.07 | none | 18,571,235 |
| | $9,353,070.49 | $4,508,485 | |

Another set of figures confirm the doubts. Of the 57 subsidiaries, 18 were profitable in each of the successive tax years, earning more than $25,000 annually. Profits actually ranged up to $200,000 annually; the average was $92,000. Advances by these subsidiaries increased in almost 9 out of 10 of these years. The constant parallel between substantial income and increasing advances, again, suggests dividends. Payment of formal dividends in such a context is not evidence that concurrent advances are not additional dividends.

There are other factors of context and degree suggesting that the advances were economic dividends as much as the formal dividends.

There was no ceiling on the balance of advances which could be accumulated in plaintiff's hands. Plaintiff offered testimony that a market would require a substantial capital expenditure for remodeling every 5 to 8 years, and thus a "repayment" of advances. Yet advances from some subsidiaries increased in each tax year, and the general trend was constantly upwards. The need for remodeling, then, did not impose an effective ceiling on an outstanding debit balance and did not produce a predictable repayment of the outstanding balance of net advances. Both the absence of a ceiling and the trend of increasing balances weigh heavily against a conclusion that the advances were loans. *See Koufman, supra; George Blood Enterprises, Inc.,* 35 TCM (CCH) 436, 446 (1976).

Inability to pay advances from a controlled corporation is a mark of a distribution rather than a loan. *Edward M. Wrenn, Jr. v. United States,* 78–1 USTC ¶ 9484 (D.C.W.D.Tenn.1978); *Al Goodman Inc. v. Commissioner,* 23 T.C. 288, 301 (1954). Plaintiff was in a liquid position and had excellent credit during the years in suit. It would have been able, had it been necessary, to borrow enough to pay the net advances. To this extent the objective indicia are consistent with an intent to repay.

The use by the plaintiff of the net advances presents a mixed picture on the issue of intent to repay. On the one hand, indicia contradicting a loan are that plaintiff had no urgent need for the sums involved and was under the management agreements unrestricted in its use of the sums advanced. Plaintiff could and presumably did use the advances throughout its business, for dividends or purchases or other of its needs. Some of the advances were invested in interest-bearing short-term certificates of deposit. On the other hand it is urged that with the cash advanced plaintiff obtained volume and cash discounts on its wholesale grocery purchases which it could pass on to

the subsidiaries. Cases on this factor, as might be expected, are inconclusive. *Compare White v. Commissioner*, 17 T.C. 1562, 1568 (1952) (finding that loans were intended despite the shareholder's personal use of the funds) *with George Blood Enterprises, Inc. v. Commissioner, supra*, (shareholder's use of the funds to purchase a lake house indicative of constructive dividends).

Absent were customary indications of loan such as the payment of interest, the giving of a promissory note, a limit on the amount involved, the presence of security or collateral for the loan or restriction on the use of the sums. There was neither reserve or sinking fund for repayment of the advances nor fixed maturity date or schedule for repayment. True, payment by plaintiff of the subsidiaries' expenses had the same effect as a partial repayment of a debit balance, but there was never a transfer of cash to a subsidiary solely for the purpose of offsetting a debit balance. Other than the demands implicit in the subsidiaries' submission of their bills to plaintiff for payment, the subsidiaries which had made advances demanded neither a formal accounting of the balances nor a transfer of cash by way of repayment. In other words, there was no attempted collections of the purported loans, and, indeed, little objective evidence of loan except the books created by the parties.

The foregoing recital illustrates the informalities attendant upon plaintiff's treatment of the advances, if they were to be loans. A certain degree of informality may be expected in dealings between a controlling shareholder and his corporation. *See Sharp, supra*. In this case, however, the informalities make clear the crucial fact that there was no way of knowing that the advances by a particular subsidiary would be repaid either at a set time or at any time in the foreseeable future. Repayment could take place only if future events required greater expenditures on behalf of a subsidiary than the sums it could advance. Though such events—reduced profitability or a need for large capital expenditures—were largely, but not completely, beyond plaintiff's control, there was a substantial possibility that they would not occur within a reasonable or even a foreseeable period of time. In many cases, net advances increased in all 9 tax years in question, and in other cases decreases did not reduce the balance even close to zero. The pattern over the years is one in which profits were steadily made and steadily transferred to the plaintiff.

What happened in the later years may shed full light on the earlier years. As was said in *Estate of Taschler v. United States*, 440 F.2d 72, 77 (3rd Cir. 1971): "What may appear to be a debtor-creditor relationship from dealings viewed within a certain span of time may turn out to be a mirage when later transactions are taken into account. The circumstances surrounding disbursements in later years and their cumulative effect may be considered in determining a taxpayer's intent prior to those years." The continuation of large and growing balances of net advances indicates that plaintiff did not have a definite intent to repay the advances; it had only a contingent intent to repay should circumstances so require. If the circumstances did not materialize, plaintiff would continue to hold and use the debit balances free and clear of any responsibility to repay the sums to the subsidiaries, as if dividends had been paid. The fact that in some instances net advances were significantly reduced or even reversed is not indicative of more than a contingent intent to repay. Future events created a definite intent to repay—only the part expended for the benefit of the subsidiary.

■ It is firmly established that a contingent intent to repay, or an intent to repay only if and when the sums are needed by the corporation, is legally insufficient to render advances to shareholders bona fide loans. *Alterman Foods, Inc. v. Commissioner, supra*, 505 F.2d at 879; *General Aggregates Corp. v. Commissioner*, 313 F.2d 25, 28 (1st Cir. 1963), *cert. denied*, 375 U.S. 815, 84 S.Ct. 47, 11 L.Ed.2d 50 (1963); *Nasser v. United States, supra*, 257 F.Supp. at 447; *George Blood Enterprises, Inc., supra*, 35

TCM (CCH) at 444–45; *O'Reilly v. Commissioner*, 27 TCM (CCH) 1543, 1547 (1968); *cf. Kaplan v. Commissioner*, 43 T.C. 580 (1965) (repayment upon shareholder's death legally insufficient to show advances to be loans). Plaintiff's contingent intent to repay in this case, then, was insufficient to render the net advances to it loans; such advances were therefore taxable dividends.

Cases relied upon by plaintiff as holding advances to be a loan involved only one or two running accounts created by a shareholder's withdrawals from a corporation. Here there were more than 50 accounts created by a large corporate shareholder withdrawing sums from 57 subsidiaries. The number, consistency and increasing amounts of the withdrawals create a pattern indicating no intent to repay, except fortuitously and in small part. Moreover, the cases relied upon by plaintiff contained factual indicators of an intent to repay which are here absent. For instance, there were attempts to settle the outstanding balance by transfer of property to the corporation (*Sharp v. Commissioner, supra*); reversals or zero balances in all the accounts in question in prior or subsequent years (*Miele v. Commissioner*, 56 T.C. 556 (1971), *aff'd*, 474 F.2d 1338 (3rd Cir. 1973), *cert. denied*, 414 U.S. 982, 94 S.Ct. 279, 38 L.Ed.2d 225; *Al Goodman Inc. v. Commissioner, supra; Thorman v. Commissioner*, 12 TCM (CCH) 963 (1953)); the shareholder's payment of capital gains tax on the account upon the dissolution of the corporation (*Shaken v. Commissioner, supra; Thorman v. Commissioner, supra*). Also, in some of those cases there were attempts by the corporation or its agents to collect the balance from the shareholder (*In re Ward*, 131 F.Supp. 387 (D.Colo.1955); *White v. Commissioner, supra*, 17 T.C. 1562 (1952)); payment by shareholder to corporation of substantial amounts of interest included by the latter in its taxable income (*Hoffman v. Commissioner*, 26 TCM (CCH) 737 (1967)); and a pledge of stock as collateral security for the note given the corporation (*Al Goodman Inc. v. Commissioner, supra; White v. Commissioner, supra*).

Each of the cases turns on its own facts. In these foregoing cases, the finder of the facts concluded, on all the evidence and on an evaluation of witnesses' credibility, that definite repayment was intended. By the same method, the conclusion reached in the instant case is that definite repayment was not intended. The only possible deterrent to this conclusion is that taxation of both the dividends claimed by the Commissioner and the formal dividends declared and paid during the years in question will mean the treatment as dividends of an unusually high level of the subsidiaries' annual earnings. But the taxpayer offers the taxing system no choice. The subsidiaries did in fact transfer virtually their entire receipts to plaintiff, their sole shareholder, and the parties chose not to file consolidated returns which might have permitted a tax-free transfer of dividends. Plaintiff chose its method of doing business, and it cannot now avoid the tax consequences of its choice. *See Alterman Foods, Inc., supra*, 505 F.2d at 878; *Wiseman v. United States*, 371 F.2d 816, 818 (1st Cir. 1967). It may be noted, finally, that plaintiff was allowed the 85 percent dividends-received deduction under section 243(a)(1) of the 1954 Code.

Plaintiff's case fails for lack of proof by a preponderance of the evidence that the annual increases in net advances from its individual subsidiaries in the tax years 1966–74 were bona fide loans or otherwise nontaxable.

## CONCLUSION OF LAW

On the basis of the findings of fact and for the reasons set forth in the opinion, it is concluded that plaintiff has failed to establish that it is entitled to more favorable tax treatment by defendant than it has already received for its taxable years 1966 through 1974. Accordingly, plaintiff has not overpaid its income taxes for such years and is not entitled to any refund thereof. The petition is dismissed.