In re James M. FISCHER, Jr., Debtor.

James M. FISCHER, Jr., Plaintiff,

v.

INTERNAL REVENUE SERVICE, Defendant.

In re Charlotte L. FISCHER, Debtor.

Charlotte L. FISCHER, Plaintiff,

v.

INTERNAL REVENUE SERVICE, Defendant.

Bankruptcy Nos. 92–06305, 93–00607.

United States Bankruptcy Court, M.D. Tennessee.

June 20, 1994.

Joe Vaulx Crockett, III, Corbett, Crockett & Van Slyke, Nashville, TN, for James M. Fischer, Jr. and Charlotte L. Fischer.

Michael J. Martineau, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for I.R.S.

---

MEMORANDUM GRANTING THE DEBTOR'S OBJECTION TO THE INTERNAL REVENUE SERVICE'S PROOF OF CLAIM

GEORGE C. PAINE, II, Chief Judge.

## I. INTRODUCTION

The issue before the court is whether a closely held corporation's monetary advances to its sole shareholder were taxable dividends or non-taxable loans. For the reasons stated

---

in this memorandum, the court finds that the advances at issue were non-taxable loans. The following constitute findings of fact and conclusions of law. Fed.R.Bankr.Proc. 7052.

## II.  PROCEDURAL BACKGROUND:

The debtor filed for Chapter 11 bankruptcy on July 21, 1992. The IRS filed an amended proof of claim seeking income taxes and interest of $1,903,522.60 plus statutory additions for the years 1990 and 1991. On May 28, 1993, the debtor filed an objection to the IRS's proof of claim. Trial was held on the debtor's objection on May 2, 1994.

## III.  FINDINGS OF FACT:

During the years 1988 through 1991, the debtor was the sole shareholder of Fischer Educational System, Inc. ("FES"). FES, in turn, owned and operated several separately incorporated technical and vocational schools located in the United States. Examples of these schools were Bliss College, Inc., Denver Automotive and Diesel College, Inc., Draughon College, Inc., Fischer Technical Institute, Inc., and Spencer College, Inc.

Between 1988 and 1991, FES experienced significant growth and expansion. Pursuant to loan covenants with FES's primary lender, First American National Bank, FES could not pay dividends to the debtor. Nevertheless, the debtor received the following monetary advances from FES during this period:

| Year | Amount |
|------|--------|
| 1988 | $2,262,000 |
| 1989 | $1,158,000 |
| 1990 | $1,395,875 |
| 1991 | $  149,708 |
| Total: | $4,965,583 |

At the time of these advances, the debtor's net worth as reflected in his personal financial statements fluctuated between a high of $36 million and a low of $17 million.

The debtor used some of these advances to purchase and develop real estate in Oklahoma City, Denver, and Virginia Beach for the construction of additional vocational schools. Once construction was completed, the debtor envisioned either selling the projects or obtaining permanent financing from traditional financial institutions to pay off FES advances.

Other FES advances were used to finance real estate projects owned by the debtor as personal investments. These were the FES office building known as Airport Plaza or Airport Executive Plaza on Murfreesboro Road in Nashville, the Four Corners Boat Dock and Marina at Percy Priest Lake near Nashville, and the Williamson Square Shopping Center project in Franklin, Tennessee.

All advances during this period were evidenced by three promissory notes executed by the debtor and payable to FES. The first note, dated January 1, 1989, was in the principal amount of $2,713,978 and allowed the debtor to borrow up to $3,500,000. The note obligated the debtor to pay the outstanding principal balance to FES on or before January 1, 1990. Interest at 10% per annum was payable twice during the period of the loan on August 31 and on December 31, 1989.

The balance on this note was renewed by a second promissory note dated January 1, 1990 in the principal amount of $3,721,577.59. It allowed the debtor to borrow up to $4,850,000 and required payment of principal and interest under the same terms as the first note. However, this note contained the additional provision of allowing FES to make demand from the debtor for payment in full of all principal and interest should the debtor fail to make payment within ten days of receiving a written demand from FES.

The balance of the second note was renewed by a third promissory note on December 30, 1990 in the principal amount of $4,907,627.47. It allowed the debtor to borrow up to $5,200,000 from FES. Repayment terms were similar to those of the second note.

FES's accountant and controller from 1983 to 1993, Ms. Connie Hipp, testified that all advances made to the debtor were contemporaneously recorded in FES's general ledger as a note receivable from the debtor. Advances were categorized according to project and recorded on worksheets entitled

"FES/Note Receivable—J. Fischer/2270–00." The number "2270–00" was the general ledger reference to notes receivable from the debtor. The "2270–00" worksheets recorded advances as credits and payments on advances as debits.

Advances were paid to the debtor with corporate checks. The check stubs recording the advances showed "2270–00," i.e. notes receivable from the debtor, as the "Acct. No." of the distribution.

In addition to FES's books, Ms. Hipp maintained a separate schedule of the advances made to the debtor called "Analysis of Stockholder Loans." This document categorized advances according to project and showed total interest paid on advances from previous years. Ms. Hipp provided a copy of this schedule and the "2270–00" worksheets to the debtor for his records.

The debtor maintained separate, personal records of these advances in his own handwriting on a document captioned "FES loans." Occasionally, discrepancies would arise between the debtor's records and those of FES as to the total balance of FES advances. Ms. Hipp and the debtor resolved such discrepancies by consulting the FES records maintained by Ms. Hipp.

The audited financial statements of FES, prepared by Touche Ross & Co. and Deloitte and Touche, showed FES advances as loans to the debtor. These firms determined the advances were loans after independently examining the books and records of FES.

The debtor paid accrued interest on the principal balance of FES advances on a yearly basis. At the end of each year, Ms. Hipp totalled all advances and computed annual interest due. The debtor paid the interest with taxable salary advances from FES.

The debtor also made periodic principal payments on advances. The "2270–00" worksheets showed numerous debits representing principal payments on FES advances. For example, on the advances made to purchase the "ATI Building" in Virginia Beach, the debtor made monthly principal payments of $1,500.00 from rents collected on the property.

Mr. Kenneth Harb, an executive vice president and director of FES, testified that the debtor treated all FES advances as loans and fully intended to repay them. Prior to 1988, the debtor fully repaid several advances from FES. These advances were repaid primarily out of profits from the growth of FES and the debtor's other investments during this earlier period.

However, between 1988 and 1991, the debtor was unable to repay all of the substantial advances received during this period. As Mr. Harb testified, this was not because the debtor never intended to repay the advances. On the contrary, the debtor vigorously sought to repay FES advances by attempting to: (1) obtain permanent, "take out" financing on the Oklahoma project to repay approximately $1.3 million of FES advances, (2) sell the Williamson Square Shopping Center to repay advances made for its purchase, (3) sell other profitable business ventures, and (4) obtain a personal, consolidation loan from one or more financial institutions and/or individuals to pay off all advances from FES.

Unfortunately, the economic downturn in the real estate market and corresponding changes in the vocational school industry and the student loan program rendered these options economically impossible. As Mr. Harb stated, FES advances would have been repaid had the debtor's projects and investments during this period been as successful as those prior to 1988.

## IV. CONCLUSIONS OF LAW:

The question facing the court is whether under these facts FES advances to the debtor between 1988 and 1991 were dividends or loans. Dividends are defined as taxable, gross income under I.R.C. § 61(a)(7). Loans, on the other hand, are not considered gross income under I.R.C. § 61(a) and thus are nontaxable. Not surprisingly, the IRS contended that FES's advances were taxable dividends, and the debtor argued they were nontaxable loans.

A "dividend" is defined in I.R.C. § 316(a) as "any distribution of property made by a corporation to its shareholders ... out of its earnings and profits." The Internal Revenue

Code, however, does not define a "loan," nor does it expressly distinguish between a "dividend" and a "loan". Accordingly, the court must rely on the case law applicable in this circuit to determine whether the advances at issue were dividends or loans.

The Sixth Circuit standard for determining whether a closely held corporation's monetary advances to its sole shareholder should be treated for tax purposes as dividends or loans originated in *Berthold v. Commissioner*, 404 F.2d 119 (6th Cir.1968). The *Berthold* court held that such advances were nontaxable loans if the parties entered into the transaction with the definite intention that the money advanced be repaid. *Id.* at 122. The plaintiff, in this case the debtor, has the burden of proof on this issue. *Id.*

The *Berthold* court noted that testimony from the taxpayer that corporate advances were intended to be repaid as loans, while a relevant factor, should be viewed with suspicion. *Id.* Obviously, such claims are in the taxpayer's best interest. *Id.* Courts, therefore, should focus on the objective manifestations of the transaction rather than the taxpayer's self-serving declarations of its nature. *Id.* To this end, the *Berthold* court identified several objective criteria for consideration:

(1) whether the corporation making the advances was closely held and controlled;

(2) whether the dividends paid by the corporation were nominal;

(3) whether notes were given for the advances allowing the corporation to enforce payment;

(4) whether security or collateral was required on the loan;

(5) whether there were repayments or efforts to force repayment;

(6) whether there was a set maturity date or time for repayment; and

(7) whether interest was paid or accrued on the corporate records.

*Id.* at 121. *Jaques v. Commissioner*, 935 F.2d 104, 107 (6th Cir.1991); *Dietrick v. Commissioner*, 881 F.2d 336, 340 (6th Cir. 1989); *Livernois Trust v. Commissioner*, 433 F.2d 879, 882 (6th Cir.1970). *See also Alterman Foods, Inc. v. United States*, 505 F.2d 873, 876–77 n. 6, 7 (5th Cir.1974); *Alterman*

*Foods, Inc. v. United States*, 222 Ct.Cl. 218, 611 F.2d 866, 869 (Ct.Cl.1979). The Fifth Circuit in *Alterman Foods*, 505 F.2d at 877 n. 7 (cited favorably by the Sixth Circuit in *Jaques*, 935 F.2d at 107), emphasized some additional objective factors:

(8) whether a ceiling existed to limit the amount of corporate advances;

(9) whether the shareholder was in a position to repay the advances when made; and

(10) whether there was any indication the shareholder attempted to repay the advances.

Several of the above factors weigh in favor of the IRS. The corporation was closely held and controlled by the debtor as sole shareholder. Loan covenants with First American prevented FES from paying dividends to the debtor. FES took no security or collateral on the advances. The court thus regards the nature of FES advances with some suspicion. *See Berthold*, 404 F.2d at 122. Nevertheless, after weighing the objective factors in the IRS's favor against those in the debtor's favor, the court concludes that FES advances were made with the intention that they be repaid.

First, FES and the debtor executed promissory notes obligating the debtor to repay all FES advances. The three promissory notes executed between 1988 and 1991 were valid and enforceable against the debtor. As a sophisticated business person, the debtor must have known that these notes could have been enforced against him by a receiver or bankruptcy trustee appointed to operate FES.

Second, the debtor made repayments on FES advances. The debtor made periodic principal payments on advances received between 1988 and 1991, as shown in the "2270–00" worksheets.

Third, the three promissory notes each specified maturity dates and times for repayment. Each note matured and was payable in full after one year. At maturity, the notes were renewed for the same period of time and under the same repayment terms.

Fourth, the debtor paid annual interest that accrued on all advances under the notes. These amounts were calculated by Ms. Hipp and payments were recorded in FES's books.

Fifth, each promissory note put a ceiling on advances to the debtor. Moreover, as Ms. Hipp and Mr. Harb testified, around 1991 First American imposed new loan covenants on FES limiting advances to the debtor.

Sixth, the debtor was in a position to repay the advances when made. The debtor's personal financial statements prepared during the periods at issue showed a substantial net worth. Based on these financial statements, the debtor appeared to have the capacity to repay the advances when made.

Seventh, the evidence strongly indicated that the debtor attempted to repay all advances. The debtor fully repaid FES advances made prior to 1988. Although the debtor could not pay off advances made between 1988 and 1991, he undertook vigorous efforts to do so. He tried to sell or obtain permanent, "take out" financing on several projects to generate capital to repay advances. He also met with several bankers and individual lenders to obtain a consolidation loan to pay off advances.

Finally, other relevant facts exist suggesting that advances were intended as loans. All general ledger entries and internal corporate schedules reflected the advances as notes receivable from the debtor. Disputes over amounts owed by the debtor were resolved by consulting the corporate records. FES's audited financial statements, based on independent assessments by two accounting firms, all showed FES advances as loans.

For the reasons stated, the court holds that the debtor has met the required burden of proof. The court concludes that FES and the debtor intended that all monies advanced be repaid. The court, therefore, finds that FES's advances to the debtor were nontaxable loans instead of taxable dividends. Accordingly, the court grants the debtor's objection to the proof of claim filed by the IRS.

IT IS SO ORDERED.