LEONARD W. HARDY and GERALDINE C. HARDY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hardy v. Commissioner
Docket No. 11403-79.
United States Tax Court
T.C. Memo 1982-225; 1982 Tax Ct. Memo LEXIS 518; 43 T.C.M. (CCH) 1210; T.C.M. (RIA) 82225; April 28, 1982. *518 In 1974, Ps withdrew cash from a corporation controlled by them, used part of such cash to purchase tax-exempt bonds, and loaned the other part of the cash to a relative to purchase tax-exempt bonds. Held, all the cash withdrawn constituted dividends received by Ps. Held, further, Ps are liable for the addition to tax under sec. 6653(a), I.R.C. 1954, relating to negligence. James Silhasek, for the petitioners. David W. Otto, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $ 394,029.74 in the petitioners' Federal income tax for 1974 and an addition to tax of $ 19,701.49 under section 6653(a) of the Internal Revenue Code of 1954. [1] After concessions by both *519 parties, the issues for decision are: (1) Whether cash withdrawn by the petitioners for their own use from a corporation controlled by them constituted bona fide loans or dividends; (2) whether other cash withdrawn from the corporation by the petitioners and advanced to their son constituted a bona fide loan by the corporation or a dividend to the petitioners; and (3) whether the petitioners are liable for an addition to tax under section 6653(a) for negligence. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Leonard W. and Geraldine C. Hardy, husband and wife, resided in Kingman, Ariz., at the time they filed their petition in this case. They filed their joint Federal income tax return for 1974 with the Internal Revenue Service Center, Ogden, Utah. Mr. Hardy first began working in the turquoise business on a part-time basis in the 1940s. At such time, he was employed by a copper mining company. It was his practice to buy turquoise from the miners and resell it to customers in Albuquerque and Gallup, New Mex. Because *520 the miners were not allowed to remove turquoise from the mines for their own benefit, Mr. Hardy paid cash when buying the turquoise from the miners. In the mid-1950s, Mr. Hardy decided to pursue the turquoise business on a full-time basis and quit his job at the copper company. He built up his business over the next few years and moved to Kingman, Ariz., in 1965. There, he built a plant which he operated as a sole proprietorship, mining and selling turquoise. In 1968, L.W. Hardy Co., Inc. (the corporation), was formed to engage in the business of mining and selling turquoise. Specifically, Mr. Hardy decided to incorporate because he needed additional capital to buy the machinery and equipment necessary to mine the turquoise for his expanding operation. Mr. and Mrs. Hardy were the incorporators of such corporation, receiving 67,536 of the initial 96,536 shares issued; thus, they received approximately 70 percent of the shares outstanding. By January 1, 1974, the petitioners held 154,000 of the 194,000 shares outstanding (79.38 percent). Additionally, Douglas R. Henslee, who is the son of Mrs. Hardy, owned 6,000 shares in such corporation in 1974. The remaining stock was held *521 by other unrelated persons. The corporate sales of turquoise increased dramatically during the years 1971 through 1974 as follows: Year
Turquoise Sales
1971
$ 233,899.78
1972
380,035.88
1973
1,405,752.13
1974
5,947,714.52
During the years 1971 through 1974, the corporation held contracts for the absolute right to take turquoise from two copper mines in Arizona. Such contracts gave the corporation's employees the right to enter the copper mines and gather the turquoise uncovered in the copper mining process. Additionally, Mr. Hardy owned the rights to a process which stabilized otherwise soft and unmarketable turquoise stone into a salable product of gem-value quality. By 1974, the corporation was a major world supplier of turquoise, with its main plant and corporate offices located in Kingman, Ariz. The corporation also maintained another plant, the Hardy Turquoise Company, in Forest Junction, Ariz. By 1975, the corporation employed approximately 260 people. Mr. Hardy was the president of the corporation and was primarily engaged in the mining, grading, and processing operations. During 1974, the corporation sold turquoise for cash, on credit, *522 and by check. During the first 7 months of that year, the corporation had cash sales as follows: 1974
Cash Sales
January
$ 40,053.25
February
59,103.16
March
82,912.67
April
123,969.28
May
115,567.90
June
98,090.60
July
24,184.50
Total
$ 543,881.36
Except for cash deposits of $ 10,000 on January 23, 1974, and $ 2,000 on January 25, 1974, no other cash was deposited in the corporate bank account between January 1, 1974 and July 21, 1974. Such cash was instead retained by the petitioners in the corporate safe to which only they had access. During 1974, the corporation used a four-part invoice system to record all sales of turquoise. Entries from such invoices were periodically posted into a journal. During the first 7 months of 1974, if a sale was paid for by check, a complete entry was made in the journal, noting the invoice number and the amount of the sale. However, if such was a cash sale, only the invoice number was entered with no corresponding entry for the amount of cash received at that time. Mrs. Hardy was the secretary and treasurer of the corporation, and she supervised the preparation of the invoices to record sales. She was *523 also responsible for the preparation of deposits in the corporate bank account, and she arranged for the deposit of all checks received in payment for turquoise. Her daughter-in-law, Gloria Henslee, was responsible for the posting of the periodic journal entries. The journal did not reveal the amount of cash sales. In 1973, the corporation hired Edgar E. Pepiton, a certified public accountant, to maintain the corporate books, prepare the corporate returns, and assist in the organization of an improved system of accounting. Mr. Petition prepared both the corporate and the petitioners' returns for 1974. He was not active in the day-to-day recordkeeping of the corporation. The petitioners provided Mr. Pepiton on a monthly basis with the corporate bank statements, check register, and deposit slips, along with a listing of accounts receivable and accounts payable to assist him in the preparation of financial statements. However, Mr. Pepiton was never provided with the sales invoices, nor was he aware of the existence of any register which sequentially recorded such sales invoices in early 1974 or that large amounts of turquoise had been sold for cash during such period. Accordingly, *524 the sales figures calculated by Mr. Pepiton reflected only the sum of the checking account deposits plus the difference in the balance of outstanding accounts receivable. The petitioners maintained a joint account in their own name with a brokerage house and made the following purchases during the first 7 months of 1974 [2]: Date
Description
Amount
1/11
500 shs TWA at 16-3/8
[3] $ 8,332.34
2/4
Puerto Rico Cmwlh bonds at 98.868
24,852.21
2/20
Puerto Rico Cmwlh bonds at 102
15,422.50
2/28
Puerto Rico Cmwlh bonds at 102-1/4
25,652.21
4/21
Puerto Rico Cmwlh bonds at 97.50
49,675.97
5/14
Puerto Rico Cmwlh bonds at 97.50
64,815.83
5/29
Puerto Rico Cmwlh bonds at 100.644
46,436.80
6/7
Navajo Co. Az. bonds at 100-1/2
71,145.67
6/10
Puerto Rico Cmwlh bonds at 99.50
25,620.31
7/5
Salt River Project bonds
88,732.20
Total
$ 420,686.04
All of the Puerto Rico bonds, Navajo County, Arizona, bonds, and Salt River Project bonds, *525 purchased by the Hardys in 1974, were municipal bonds, the interest on which was exempt from Federal income taxation. The petitioners paid for such bonds with cash taken from the corporate safe. In addition to the cash which the petitioners withdrew from the corporate safe to purchase tax-exempt bonds, they also retained $ 31,585.00 in cash in such safe for their own use and withdrew cash in the amount of $ 76,883.11 which they advanced to Mr. Henslee as follows: January 17, 1974
$ 9,940.88
February 13, 1974
10,281.67
February 27, 1974
5,223.79
March 5, 1974
5,522.31
March 13, 1974
10,381.67
April 23, 1974
5,124.17
May 28, 1974
10,295.90
June 6, 1974
10,251.88
June 28, 1974
9,860.84
Mr. Henslee and his wife also used such cash to purchase tax-exempt bonds. On July 9, 1974, two special agents of the Internal Revenue Service visited the offices of the corporation for the purpose of interviewing the petitioners. At the time of the visit, the special agent in charge, David McCluskey, was aware that the Hardys had been purchasing large amounts of bonds with cash.In meeting with Mr. Hardy, the agents identified themselves and specifically asked Mr. *526 Hardy if he had any loans outstanding or had borrowed any money from the corporation. Mr. Hardy stated that he had received no loans from the corporation, that he owned no bonds, and that he never had more than $ 10,000 in cash on hand. Immediately after the visit by the IRS agents, Mr. Hardy contacted his attorney, John Cronkhite. In August, Mr. Cronkhite was informed for the first time by the petitioners that they had used corporate cash to provide for their own retirement through the purchase of tax-exempt bonds. They also informed him that they had never reported such cash as income on the corporate books. In an attempt to reconstruct the total amount of cash withdrawn that year, Mr. Cronkhite utilized the stock brokerage account purchase statements of the petitioners and the Henslees and added the amount of the petitioners' cash on hand of $ 31,585.00. Mr. Cronkhite concluded that the total cash withdrawn that year was $ 520,669.63. Having reached that conclusion, Mr. Cronkhite then directed Mr. Pepiton to record the following general journal entry on the corporate books "as of June 30" to reflect the sum of cash withdrawn by the petitioners: Debit - Loans Receivable - Stockholder
(Gloria Henslee)
$ 76,883.11
Debit - Loans Receivable - Stockholder
(Leonard & Geraldine Hardy)
443,786.52
Credit - Sales
To record loans made to stockholders
520,669.63
*527 No such entries were on the books on August 5, 1974, the date special agent McCluskey examined the corporate books. Mr. Cronkhite also advised that a board of directors meeting be held to discuss the cash withdrawn by the Hardys. On September 21, 1974, a board meeting was held at which the cash withdrawals were revealed. Such meeting was the first occasion at which there was ever any mention of the corporation making loans to the Hardys. At such meeting, it was announced that promissory notes were being given to the corporation bearing interest at 8 percent with payments due on or before November 1, 1977. On or about October 15, 1974, Mr. Cronkhite prepared the following document as a promissory note payable to the corporation. The petitioners were listed as obligators on the note reciting in part as follows: This Note shall bear interest at the rate of eight percent (8%) per annum, payable in semi-annual installments throughout the term of this Note commencing on November 1, 1974, which interest shall be computed on each of the following increments from the date designated for each such loan withdrawal: $ 24,852.24
January 17, 1974
15,442.50
February 13, 1974
25,800.00
February 21, 1974
49,675.97
April 17, 1974
64,815.83
May 7, 1974
46,436.80
May 21, 1974
71,145.67
May 31, 1974
31,585.00
June 1, 1974
25,620.31
June 4, 1974
88,732.20
June 28, 1974
*528 The note recited that "This Note shall be secured by a pledge of common stock and bearer bonds to be delivered to the Lendor and retained in its corporate offices at Kingman, Arizona." A similar note was executed by the Henslees to reflect the $ 76,883.11 received by them. There is no evidence that collateral for these notes was ever transferred to the corporation. With the exception of the June 1, 1974, entry of $ 31,585, the dates listed on the petitioners' note corresponded with the amounts withdrawn from the corporation's safe and utilized to purchase bonds. On December 19, 1974, the petitioners deposited $ 31,585 cash into the corporate checking account. The deposit was accounted for on the corporate books and records as follows: Debit - Sales
$ 31,585.00
Credit - Interest income
$ 22,830.16
Credit - Accounts receivable -
Stockholder -
L. W. Hardy
8,754.84
To record payment received from Hardy
on note in 1974 and orig. reflected
in sales.
The petitioners deducted $ 22,830.16 as interest on their joint 1974 Federal income tax return. Other than the document executed on October 15, 1974, in the form of a promissory note, no other documents *529 purporting to be promissory notes or evidences of indebtedness were executed by the petitioners in favor of the corporation that year. Special agent McCluskey was the first person to inform Mr. Pepiton, the petitioners' accountant, that they had removed money from the corporation. Mr. Pepiton was unaware that the petitioners had purchased tax-exempt bonds at the time he prepared the Hardys' return for 1974. In late 1974, the petitioners executed an additional document prepared by Mr. Cronkhite. The petitioners signed such document on behalf of the corporation as well as themselves personally. Such document referred to the earlier note of October 15, 1974, and provided in pertinent part: Both parties consider the Promissory Note to represent a valid debt obligation from the Hardys to the corporation, but wish to enter into this Agreement to insure the proper allocation of all repayment amounts made by the Hardys. All monies paid by the Hardys to the corporation pursuant to the said Promissory Note are intended to be repayment of the valid loan obligation and are specifically not intended to be contributions to the capital of the corporation. Therefore, should the $ 444,106.52 *530 amount transferred from the corporation to the Hardys be ultimately determined, for any reason, to be other than a valid loan, the corporation shall be obligated to treat all payments made pursuant to the said Promissory Note as a stockholder loan from the Hardys and the corporation shall repay all such amounts to the Hardys as soon as reasonably possible. The Henslees executed a similar agreement with the corporation. Mr. McCluskey's investigation of the petitioners resulted in his recommendation that they be prosecuted for tax evasion with respect to their joint Federal income tax return for 1973. Mr. McCluskey based his recommendation on a number of 1973 cash expenditures made by the petitioners, including the purchase of bonds, which were determined by him to be from diverted corporate receipts. The petitioners were each indicated and convicted for evasion of income taxes under section 7201 with respect to their 1973 Federal income tax return. In his notice of deficiency for 1974, the Commissioner determined that the petitioners' withdrawals of cash from the corporation did not constitute bona fide loans but were dividends received by them. The Commissioner also determined *531 that the petitioners had received other unreported income, that they were not entitled to a number of deductions claimed by them, and that they were liable for an addition to tax under section 6653(a) for negligence. At the trial, the Commissioner was allowed to amend his answer to claim an additional deficiency based on the allegation that the cash which the petitioners withdrew from the corporation and advanced to the Henslees also constituted dividends received by the petitioners. OPINION The first issue for decision is whether the cash withdrawn in 1974 by the petitioners from the corporation for their own use constituted taxable dividends or bona fide loans. Whether such withdrawals were dividends or loans is a question of fact which must be resolved in light of all the facts and circumstances surrounding the transactions. See John Kelly Co. v. Commissioner,326 U.S. 521 (1946). The petitioners have the burden of proving that the withdrawals were intended to be loans to them. Rule 142(a), Tax Court Rules of Practice and Procedure[4]; Welch v. Helvering,290 U.S. 111 (1933). *532 While there is no fixed rule of thumb for distinguishing dividends from loans, some generally applicable criteria are available to guide us in resolving the ultimate question of what was really intended by the parties at the time they entered into the transaction. See, e.g., Williams v. Commissioner,627 F. 2d 1032 (10th Cir. 1980), affg. a Memorandum Opinion of this Court; Berthold v. Commissioner,404 F. 2d 119, 122 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Chism's Estate v. Commissioner,322 F. 2d 956 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; see generally Bittker and Eustice, Federal Taxation of Corporations and Shareholders, par. 7.05 (3d ed. 1971); Werner, "Stockholder Withdrawals--Loans or Dividends?", 10 Tax L. Rev. 569 (1955). The factors considered by the courts include: the extent of stockholder control, the dividend history of the corporation, the magnitude of the advances, the presence or absence of conventional indicia of debt, the treatment of advances in the corporate financial statements, authorization by the corporation, the pledging of collateral as security, the *533 payment of interest, and the ultimate repayment of the amounts withdrawn; but no single factor is determinative. See Alterman Foods, Inc. v. United States,222 Ct. Cl. 218, 611 F. 2d 866, 869 (1979); see generally 1 I. Schreiber, Ed., How to Take Money Out of a Closely-Held Corporation, p. II-17 (1979). When the persons withdrawing funds from a corporation are in control of that corporation, the situation warrants special scrutiny.E.g., Wilkof v. Commissioner,636 F. 2d 1139 (6th Cir. 1981), affg. per curiam a Memorandum Opinion of this Court; Roschuni v. Commissioner,29 T.C. 1193, 1202 (1958), affd. 271 F. 2d 267 (5th Cir. 1959); Baird v. Commissioner,25 T.C. 387, 393 (1955). Although the Hardys were not the sole owners of the corporation, the record reveals that they were in actual control of its day-to-day affairs. The record also shows that there was a marked change in their method of doing business after they were visited by the special agents of the IRS on July 9, 1974, and realized that they were being investigated by the IRS. Before the visit of the special agents, no adequate records *534 were kept of cash sales and cash withdrawals by the Hardys. In 1974, the total sales of the corporation exceeded $ 5 million, and under the Hardys' direction, the corporation and recently commenced the maintenance of more corporate records. A sales invoice was prepared for each sale, and a journal was maintained sporadically.The invoices and journal recorded the amounts of sales when paid for by check or when an account receivable was established. Mrs. Hardy, who was in charge of maintaining the records, deposited all checks received in payment for turquoise. However, the invoices and journal omitted virtually all of the proceeds from cash sales, and those unreported proceeds were never deposited in the corporate bank account. All cash was stored in the safe to which only the Hardys had access. Thus, at that time, there was no corporate record made of the amount of each cash sale or of the amount of each cash withdrawal, nor was there a record of the aggregate amount of such withdrawals. Moreover, when the Hardys delivered their records to their accountant before the investigation, they included the record of bank deposits and accounts receivable, but they never advised him of *535 the amount of sales that had been made for cash or of their withdrawal of such cash from the corporation. Nor were the other stockholders informed before the investigation of such cash sales or cash withdrawals, and there was no corporate action authorizing the Hardys to withdraw such cash as loans. When the agents asked Mr. Hardy about cash sales and corporate loans, he refused to disclose the facts. This method of treating cash sales and cash withdrawals prior to the IRS investigation completely fails to convince us that the Hardys had any intention of repaying the withdrawals. The changes that occurred after the Hardys learned of the tax investigation do not convince us that they intended to repay the cash when it was withdrawn. When they consulted their attorney, Mr. Cronkhite, he recognized that they had a problem. He was able to compute the total amount of the withdrawals by use of the brokerage records, and he advised the accountant to make an entry in the corporate records showing the Hardys' liability to the corporation for that amount. He advised the Hardys to inform the other stockholders of their cash withdrawals and to secure corporate action authorizing a loan *536 to them of that amount. He prepared a promissory note payable to the corporation, which the Hardys executed. In December 1974, the Hardys made a payment of $ 31,585.00 to the corporation, of which they treated $ 22,830.16 as interest on a loan and $ 8,754.84 as repayment of principal. Yet, all these events occurred long after the cash withdrawals and only after the Hardys learned of the tax investigation and sought legal counsel. Consequently, such events have little weight in determining the Hardys' intention when the cash withdrawals took place in the first half of 1974. Chism's Estate v. Commissioner,supra;Electric and Neon, Inc. v. Commissioner,56 T.C. 1324, 1338 (1971), affd. without pub. opinion 496 F. 2d 876 (5th Cir. 1974); Fisher v. Commissioner,54 T.C. 905, 910 (1970). The petitioners rely on Hoffman v. Commissioner,T.C. Memo. 1967-158, for support, but that decision is not apposite. In Hoffman, the shareholder withdrawals were all noted on the corporate books as loans, with notations made both on the check register and stubs that each withdrawal was a loan. In addition, *537 the corporate financial statements reflected the withdrawals as loans. In the present case, none of these conditions existed. In the light of this record strongly indicating that the cash withdrawals were not loans, the petitioners' explanation that they customarily dealt in cash and customarily did not disclose their business affairs to others is not persuasive. Accordingly, we conclude and hold that the cash withdrawals by the petitioners in 1974 were dividends and not loans. It follows that they are not entitled to a deduction for the payment of any interest with respect to the alleged loans. The second issue for decision is whether the cash withdrawn from the corporation by the Hardys in 1974 and transferred to the Henslees constituted dividends taxable to the Hardys or loans by the corporation to the Henslees. Since this issue was not raised by the notice of deficiency, the Commissioner has the burden of proving that such withdrawals were dividends received by the petitioners. Rule 142(a); Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). In support of their position that the cash transferred to the Henslees did not represent dividends, the Hardys *538 testified that they withdrew such cash from the corporation as officers of the corporation and loaned it to the Henslees. However, before the tax investigation, there were no corporate records reflecting the withdrawal of the cash transferred to the Henslees, no records showing that the Henslees incurred an indebtedness to the corporation, no corporate action authorizing loans to the Henslees, and no reporting of the proceeds of the cash sales which were diverted to the Henslees. The only corporate records treating such cash as loans were made after the funds were actually transferred to the Henslees and after the Hardys learned of the tax investigation and sought legal counsel. Moreover, the fact that Mr. Henslee was Mrs. Hardy's son may explain why the Hardys were willing to withdraw cash from the corporation and advance it to the Henslees without any obligation of repayment. On this record, there is no basis for treating the cash transferred to the Henslees any differently than that used by the Hardys, and accordingly, we hold that the Commissioner has carried his burden of proving that such cash constituted additional dividends received by the Hardys. [5]
*539 The last issue for decision is whether the Hardys are liable for an addition to tax under section 6653(a). That section provides that if any part of an underpayment of tax is due to either negligence or intentional disregard of rules and regulations, an amount equal to 5 percent of the total amount of the underpayment is added to the deficiency and collected as a part thereof. Since this issue was raised in the notice of deficiency, the Hardys have the burden of proving that the underpayment was not due to negligence or intentional disregard of rules and regulations. Rule 142(a); Enoch v. Commissioner,57 T.C. 781, 802 (1972); Courtney v. Commissioner,28 T.C. 658 (1957). A taxpayer has a duty to maintain books and records sufficient to establish the amount of gross income and deductions to be shown on a return. See. 1.6001-1(a), Income Tax Regs. If he uses an accountant to prepare his returns, the taxpayer has an obligation to supply full and correct information to his accountant. Enoch v. Commissioner,57 T.C. at 802; SoRelle v. Commissioner,22 T.C. 459, 489 (1954). The records maintained by the Hardys *540 on behalf of themselves and the corporation were clearly insufficient to reflect fully the income of the corporation and the Hardys, and the information which the Hardys furnished the accountant was likewise insufficient to enable him to prepare proper returns. In maintaining that they were not negligent, the Hardys argue that they employed an accountant and an attorney specializing in tax matters and that the corporate records, as reconstructed by the accountant and attorney, consistently treated the cash withdrawals as loans to the Hardys. However, such argument is not persuasive in this case. In cases accepting such argument, the taxpayer has acted in good faith, has provided his accountant or attorney with all relevant information, and has relied on the advice of the accountant or attorney as an expert with regard to a matter with which the taxpayer was not familiar. See Hill v. Commissioner,63 T.C. 225, 251 (1974), consol. case Tenner v. Commissioner, affd. without pub. opinion 551 F. 2d 313 (9th Cir., Feb. 22, 1977); Nelson v. Commissioner,19 T.C. 575, 581 (1952). The Hardys relied on Nelson v. Commissioner,supra, *541 but the facts of that case are readily distinguishable. There, the petitioners advanced money to a corporation and relied on the advice of their accountant that cash distributions from the corporation constituted repayment of a loan. The Court highlighted that the petitioners' failure to report such income was in good faith, based solely on the advice of the accountant who "was fully apprised of the facts relating to the distribution." 19 T.C. at 581. Here, when the Hardys withdrew the cash from the corporation and made no records of the withdrawals, they were not acting on expert advice; they sought such advice only after they realized that they might be in trouble. Hence, we hold that the petitioners have failed to prove that the underpayment of their tax was not due to their negligence.
The other issues have been settled as a result of concessions by both parties. Accordingly, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during 1974.↩
2. There are some slight discrepancies between the stipulation of the parties and other evidence in the record; we shall use the stipulated figures.↩
3. This purchase was paid with proceeds of prior sale.↩
4. All references to a Rule are to the Tax Court Rules of Practice and Procedure.↩
5. The fact that the Henslees entered into a stipulated decision involving their own tax liability for 1974 is not determinative of any issue in this case.↩