## In re AIR CRASH AT DETROIT METROPOLITAN AIRPORT, DETROIT, MICHIGAN ON AUGUST 16, 1987.

**Mary Ann RATLIFF, et al., Plaintiffs,**

v.

**NORTHWEST AIRLINES, INC., et al., Defendants.**

**Richard F. CORONA, Jr., Personal Representative of the Estate of Jean C. Corona, deceased, Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., et al., Defendants.**

**Carlos VALASQUEZ, Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., et al., Defendants.[1]**

MDL No. 742.
Nos. 88–2347, 89–3699 and 87–3263.

United States District Court,
E.D. Michigan, S.D.

Oct. 4, 1991.

---

**1.** The *Valasquez* case is one of six cases that have been labelled "ground" or "bystander" cases because these Plaintiffs were not passengers on Northwest Airlines Flight 255; rather, they were bystanders who allegedly suffered emotional or physical injuries from flying debris or from viewing the accident site. Thus, this Order also pertains to: *Atkins v. Northwest Airlines,* 87–3264; *Twonder Davis and Calvin Davis, III v. Northwest Airlines,* No. 87–4010; *Twonder Davis, as Next Friend of Calvin Davis, IV, v. Northwest Airlines,* 87–4011; *Thomas v. Northwest Airlines,* 87–4012; *Beddingfield v. Northwest Airlines,* 89–1459.

Jerry Skinner, Cincinnati, Ohio, for plaintiffs in No. 88–2347.

Robert Parks, Miami, Fla., for plaintiff in No. 89–3699.

Richard F. Schaden, Bruce Wilson, David Katzman, Birmingham, Mich., for plaintiff in No. 89–3263.

Carroll E. Dubuc, Michael Selter, Washington, D.C., for defendants.

## ORDER

JULIAN ABELE COOK, Jr., Chief Judge.

The Plaintiffs in these cases have filed similar motions for partial summary judgment, Fed.R.Civ.P. 56(c), against the Defendant, Northwest Airlines, Inc. (Northwest) (filed on 6/26/91 (Ratliff); 6/27/91 (Corona); and 7/2/91 (Bystander Plaintiffs)).[2] The issue is whether these Plaintiffs, who were not parties to the underlying joint liability trial in which Northwest was found liable by a jury for the crash of its aircraft (Northwest Airlines Flight 255) on August 16, 1987 at Detroit Metropolitan Airport, should be permitted to apply the doctrine of offensive collateral estoppel and obtain a finding of liability against Northwest.[3] For the following reasons, this court will grant the motions.

### I.

On August 16, 1987, Northwest Flight 255, a DC–9 aircraft that had been manufactured by the McDonnell Douglas Corporation (MDC), crashed on takeoff at the Detroit Metropolitan Airport. During the takeoff, the airplane did not attain an altitude that was sufficient to avoid hitting a light pole in the parking lot of the National

**2.** Summary judgment may be granted when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. For a more thorough statement of the requisite analysis, see *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–27, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Burkart v. Post-Browning, Inc.,* 859 F.2d 1245, 1249 (6th Cir. 1988).

**3.** Courts and commentators have differed in the terminology used when discussing the effects of judgments in subsequent cases. The term res judicata has a narrow and broad meaning. Res judicata in its technical and narrow sense refers to the concept of claim preclusion, which prescribes that the "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981).

Collateral estoppel refers to the concept of issue preclusion, which means that "a decision precludes relitigation of the same issue on a different cause of action between the same parties once a court decides an issue of fact or law necessary to its judgment." *Duncan v. Peck,* 752 F.2d 1135, 1138 (6th Cir.1985). Res judicata had been used broadly to mean both the narrower concepts of claim and issue preclusion (or res judicata and collateral estoppel). This court prefers the easily understood terms of (1) claim preclusion and (2) issue preclusion.

The instant matters involve questions of issue preclusion: Does the federal court diversity judgment in which Northwest was found liable for the crash of Northwest Flight 255 preclude it from challenging claims of negligence by other parties in subsequent federal diversity actions arising out of the same crash? To be more precise, this question involves the application of offensive or nonmutual issue preclusion.

Car Rental Company (NCR). Upon impact, the airplane crashed on Middlebelt Road and slammed into a highway overpass. One hundred and fifty-six (156) people died in this tragedy and numerous others were injured. The Ratliff and Corona Plaintiffs represent the Estates of two passengers who died in the crash.

The first case arising out of this accident was filed with this court on August 28, 1987, charging Northwest and MDC with being responsible for the accident. Both of the Defendants denied the Plaintiff's contention.[4] Thereafter, Northwest filed cross-claims and third-party complaints for contribution and indemnity against MDC, Texas Instruments (TI), NCR, the United States,[5] and CAE Electronics, Inc. MDC filed cross-claims and counterclaims for contribution and indemnity against Northwest. In turn, Northwest filed complaints against MDC and the third-party defendants, seeking damages from them for the loss of the aircraft hull.

On December 9, 1987, the Judicial Panel on Multidistrict Litigation ordered the transfer of all Flight 255 federal cases to this district for consolidated pretrial proceedings. On August 18, 1989, all of the multidistrict litigation cases were transferred to, and consolidated in, this court for trial. Order, *In re Air Crash Disaster at Detroit Metropolitan Airport, Detroit, Michigan on August 16, 1987,* 737 F.Supp. 391 (E.D.Mich.1989).

On April 18, 1988, this court appointed a Plaintiffs' Steering Committee (PSC) to pursue pretrial matters on behalf of all the multidistrict federal Plaintiffs. *See* Practice and Procedure Order No. 2, MDL No. 742, at 3–4 (E.D.Mich. April 18, 1988); *see also* Order, MDL No. 742, at 10 (E.D.Mich. August 18, 1989) (stating intention of court to appoint PSC to serve as trial counsel for prosecuting joint liability trial on behalf of all Plaintiffs).

The pretrial proceedings were extensive, consuming over two years and resulting in over 200 days of depositions, 1,400 docket entries, and 175 written orders by this court. The first witness at trial was sworn on October 12, 1989. The trial proceedings followed the path of the pretrial proceedings in terms of consumption of time, number of issues, docket entries, exhibits, and court orders.

Against this trial background are settlement negotiations and actual settlements. Prior to the start of the joint liability trial, Northwest settled a number of individual cases, some of which involved stipulations not to contest liability in exchange for a compensatory damages-only trial.

After considering various proposals with respect to the procedure for addressing all of the issues in the case, this court determined that it would resolve the litigation through a sequence of trials. First, the court would conduct a joint liability trial involving the claims of all nonsettling Plaintiffs against Northwest and MDC, and of all claims for contribution and indemnity between Northwest and MDC.[6] Second, damage trials would follow in order to determine the amount of the compensation that would be payable to the nonsettling Plaintiffs and those Plaintiffs who accepted damages-only stipulations. Third, a second liability trial would be held to resolve Northwest's third-party claims.

Jury selection for the joint liability trial began on October 2, 1989. During the voir dire, Northwest advised the court, in camera, that it had reached a settlement with (1) the Plaintiffs whose claims were governed by the Warsaw Convention, workers' compensation statutes, or the provisions of an employee flight pass, and (2) the vast majority of the paying passengers who were injured or deceased as a result of the accident. Subsequent to the consummation of the global settlements, this court permitted those Plaintiffs who had declined to

---

**4.** Since the filing of the initial lawsuit, there have been over one hundred and fifty cases filed in a federal court as a result of this air disaster.

**5.** On December 5, 1989, Northwest dismissed the United States from the case.

**6.** The court has severed Northwest's third-party complaints.

settle with Northwest to sever their claims against the air carrier from the liability trial. As a result of these events, the litigative posture of the joint liability trial commenced with (1) the Plaintiffs pursuing their claims against MDC only, (2) Northwest remaining in the case as a Third–Party Plaintiff and pursuing its claims against MDC, and (3) MDC seeking relief against Northwest through an adjudication of its cross-claims and counterclaims.

On February 14, 1990, MDC reached settlements with an additional wrongful death claimant and the remaining personal injury claimants. On March 28, 1990, this court was advised of the likelihood of settlements with most or all of the remaining Plaintiffs.

On April 6, 1990, the last Plaintiff accepted MDC's offer of settlement. On August 16, 1990, following the final submission of the requisite documentation by the Plaintiffs, the court determined that there were no Plaintiffs remaining in the joint liability trial. On September 4, 1990, this court granted the PSC's motion to be relieved of the responsibility of attending and participating in the trial.

On May 8, 1991, the jury reached a verdict and found Northwest to be responsible for the accident. *See* Verdict Form (Attachment A). On May 31, 1991, this court issued a final judgment on these claims. *See* Final Judgment On Claims Between Northwest Airlines and McDonnell Douglas (Attachment B). Ratliff, Corona, and the Bystander Plaintiffs now seek to apply the finding of liability against Northwest in that trial to their respective cases, to which Northwest objects.[7] During the pendency of these motions, this court denied Northwest's motion for a judgment notwithstanding the verdict and its alternative motion

for a new trial but granted in part its motion to amend the judgment. *See* October 1, 1991 Amended Final Judgment (Attachment C).

Neither Ratliff, Corona, nor the Bystander Plaintiffs was a party to the trial between Northwest and MDC. With the advent of the global settlement between Northwest and most of the Plaintiffs, all Plaintiffs had three choices: (1) settlement, (2) severance, or (3) entering into a stipulation not to contest liability in exchange for a damages-only trial. In a Notice of Election of Severance dated October 31, 1989, Ratliff elected to sever her claims from the consolidated liability trial and preserved her claim against MDC for that trial. The Bystander Plaintiffs also elected to sever their claims against Northwest. Corona did not file his suit against Northwest until December 22, 1989, after the start of the joint liability trial.

## II.

◼ A threshold issue is whether federal or state law must be applied in order to determine the collateral estoppel effect of a federal court judgment that is based on diversity jurisdiction in a subsequent federal diversity suit. The Plaintiffs contend that federal law controls. Northwest submits that state law (Michigan)[8] governs.

This choice of law issue highlights the tensions that arise between state and federal law when a federal court sits in diversity. Not unexpectedly, various courts and commentators have conflicting opinions about the proper analysis and result.

The presumed rationale for applying state law of collateral estoppel to a federal diversity judgment in a successive diversity

---

7. Corona seeks a finding of "liability" in his case. Ratliff seeks a finding "on the issues of liability, causation and willful misconduct." Ratliff Motion, at 1. In her amended complaint, Ratliff alleged willful misconduct against Northwest in her claim for punitive damages. Amended Complaint, Count IV, paragraph 27 (December 28, 1988). The Bystander Plaintiffs request partial summary judgment "on the issues of liability including exemplary damages." Bystander Plaintiffs' Motion for Summary Judgment on the Issue of Liability, at 3.

8. Ratliff denies that the law of Michigan would apply in the event that state law controls this issue, but she does not articulate what law should apply. Since the Court will apply federal law, this choice of law issue need not be addressed at this time. However, for purposes of this motion only, since the only state law that has been referenced is the law of Michigan, the Court will look to that law in evaluating the policies underpinning issue preclusion in general and mutuality in particular.

suit flows from the reasoning of the time-honored case of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In *Erie*, the Supreme Court held that a federal court, sitting in diversity jurisdiction, was required to apply the law of the state in which it sits in resolving questions of substantive law:[9]

> Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.
>
> ... There is no federal general common law.

*Id.* at 78, 58 S.Ct. at 822.

In the context of the present motions, the syllogism becomes (1) in a diversity case, questions of substantive law are governed by state law, (2) the issue of collateral estoppel is a question of substantive law, and therefore, (3) state law determines the collateral estoppel effect of a federal diversity judgment that is based on state law in a subsequent diversity suit. *See Lane v. Sullivan*, 900 F.2d 1247, 1250 (8th Cir.1990) ("Just as the law of Arkansas governs in its state courts, it governed in the cases before [Federal] Judges Harris and Arnold sitting in diversity, and so it governs us in the application of collateral estoppel in this case.").

Northwest urges this Court to apply state law on the basis of *Erie* principles and the cases of *Migra v. Warren City School District Bd. of Educ.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) and *McAdoo v. Dallas Corp.*, 932 F.2d 522 (6th Cir.1991). *Migra* involved the res judicata effect of a state-court judgment in the context of a subsequent suit in federal court under 42 U.S.C. §§ 1983 and 1985. The Supreme Court decided that state law controls the legal analysis. Its reasoning stemmed from a straightforward reading

of the Full Faith and Credit Clause of the United States Constitution,[10] which has been implemented by the statute of that name, 28 U.S.C. § 1738:

> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

Thus, not surprisingly "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." 465 U.S. at 81, 104 S.Ct. at 896. *See Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."); *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982) (same). Accordingly, in the absence of federal law modifying the operation of section 1738, the preclusive effect of a state-court judgment in federal court is determined by state law.

In *McAdoo*, which involved the effect of a state-court judgment in a subsequent federal diversity case, the United States Court of Appeals for the Sixth Circuit (Sixth Circuit) held that *Migra* "interprets 28 U.S.C. § 1738 as requiring us to adopt the same doctrine of collateral estoppel as the state in which the earlier judgment was rendered." 932 F.2d at 524.

The essence of Northwest's position is that, since a federal court sitting in diversity applies state substantive law to the mer-

---

**9.** The substance/procedure test outlined in *Erie* is not talismanic, and the *Erie* doctrine has evolved considerably. *See, e.g., Guaranty Trust Company v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) (establishing the so-called "outcome determinative" test); *Carnation Co. v. T.U. Parks Const. Co.*, 816 F.2d 1099, 1100–02 (6th Cir.1987).

**10.** This provision reads:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. Const., Art. IV, § 1.

its of the action, a federal diversity judgment is nothing more than a state-court judgment, the preclusive effect of which should be determined by state law under *Erie, Migra,* and *McAdoo.* In the present circumstances, the court does not agree.

*Migra* and *McAdoo,* as well as Northwest in *Ratliff, Corona,* and the Bystander cases, presuppose the application of section 1738. However, *Ratliff, Corona,* and the Bystander cases do not involve the preclusive effect of state-court judgments. Rather, they involve federal court diversity judgments that happen to be based, in part, on state law.[11] Therefore, section 1738, which by its terms applies only to state court judgments, is inapposite, as are *Migra* and *McAdoo.*

Although some courts have resolved the preclusion issue by following a facile application of *Erie,* as exemplified by the above syllogism, and inevitably applied state law, some courts have taken the other extreme, holding that a federal court should always refer to federal law when determining the preclusive effect of a prior federal judgment, regardless of the jurisdictional basis. *See, e.g. Aerojet–General Corp. v. Askew,* 511 F.2d 710 (5th Cir.), *cert. denied sub nom. Metropolitan Dade County, Florida, v. Aerojet–General Corp.,* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975).

However, the resolution of this issue requires more than a mechanical application of *Erie.* With the advent of the Federal Rules of Civil Procedure, and the recognition that federal courts are not merely acting as state courts when presiding over diversity cases, the gravitational pull of *Erie* does not inexorably lead to the application of state law simply because the matter embraces substantive law. In *Migra,* the Supreme Court recognized that "the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal

courts." 465 U.S. at 81, 104 S.Ct. at 896 (quoting *Allen,* 449 U.S. at 96, 101 S.Ct. at 415). Not to be overlooked is the power and duty of a federal court to protect its own judgment. Wright, Miller and Cooper, *Federal Practice and Procedure* § 4472, at 733 (1982) ("[T]he purpose of diversity jurisdiction to afford a good tribunal and a good judgment suggests that federal courts be able to control many res judicata consequences of their judgments.").

The Restatement (Second) of Judgments wisely does not take an all or nothing approach, instead balancing the policies that come into play:

> In determining whether state law governs the effect of a judgment, the inquiry is essentially the same as in any other problem concerning the relations between federal and state law. Inquiry is first made whether any Federal or statutory provision is dispositive of the matter. Reference then may be made to federal procedural law, both that established in the Federal Rules and that established in decisional law construing the nature of the federal judicial authority. In connection with either federal legislation or the Federal Rules, it must be established that the rule in question represents a valid exercise of federal authority. Broadly speaking, decisions of the Supreme Court hold that federal authority may be exercised not only with regard to matters within the domain of federal substantive regulation but also, concerning adjudication in federal court, with regard to procedural matters. Matters not included in the foregoing categories are, by exclusion, determined according to state law.
>
> The rules of res judicata are not easily classifiable for purposes of determining whether a federal rule or a state rule should be used to determine a particular effect of a federal judgment. Some aspects of the rule of res judicata reflect

---

**11.** The jury in the instant case also determined issues that were governed by federal law. For example, the issue of willful and wanton misconduct was governed by the so-called Warsaw Convention. *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland, October 12, 1929, adhered to by the United States June 27, 1934, 49 Stat. 3000, 3014, reprinted in 49 U.S.C.App. note following § 1502.

primarily procedural policies. Thus, the basic rules of claim and issue preclusion in effect define finality and hence go to the essence of the judicial function.... These should be determined by a federal rule.

*Id.* § 87, at 317 (1982). Similarly, Professors Wright, Miller, and Cooper advise that an exacting scrutiny of the divergent principles of the different preclusion concepts is required: "Some may be closely bound to substantive law, others may rest on important procedural interests of the court that entered the first judgment, and yet others may relate primarily to procedural interests of the court that entertains the second action." Wright, Miller, and Cooper, *Federal Practice and Procedure* § 4472, at 741 (1982). Compare *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 42–43 & nn. 3–4 (2d Cir.1986) (preclusion question affected important procedural interest of federal court; thus federal law of preclusion applied), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987) with *Lowell Staats Mining Co. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1274 (10th Cir.1989) (as general rule, federal law applies to res judicata issue in successive diversity actions, but federal law incorporates state law when issue is more substantive, as with the concept of privity). Thus, the instant analysis must proceed from, but not end at, (1) *Erie* principles, and (2) the federal and state laws of preclusion and their underlying policies.

Northwest and the Plaintiffs argue for the application of state and federal law, respectively, on the basis of mutuality, which means that "both the litigants must be alike concluded by the judgment or it binds neither." *Howell v. Vito's Trucking Co.*, 386 Mich. 37, 45, 191 N.W.2d 313 (1971) (citation omitted). Michigan still requires mutuality, *Lichon v. American Ins. Co.*, 435 Mich. 408, 427–28, 459 N.W.2d 288 (1990), whereas federal law does not. *Allen*, 449 U.S. 90, 101 S.Ct. 411. Since the Plaintiffs were not parties to the earlier trial, mutuality is lacking. Thus, the choice of law issue is dispositive.

The three reasons that the Michigan Supreme Court has expressed for retaining the mutuality requirement are (1) the doctrine has not been abandoned, in whole or in part, in all jurisdictions, (2) its abandonment would not necessarily promote the ends of justice or promote efficiency in the courts of Michigan, and (3) on balance it is not unfair to retain the doctrine in favor of the adversarial system so that one contestant is not declared the loser to an unknown competitor. *Howell*, 386 Mich. at 49–52, 191 N.W.2d 313.

None of these reasons are intertwined with state substantive law. Although they express concerns about state court adjudication in Michigan, these concerns do not affect a federal court. Federal law of collateral estoppel contains its own protections, striking a balance between fairness and efficiency. *See, e.g., Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (collateral estoppel has dual purpose of protecting litigants from burden of relitigating identical issue and of promoting judicial economy by preventing needless litigation).

On the other hand, this court entered the judgment and is entertaining the second action in which it is proffered, creating finality and efficiency interests in this court. Aptly stated,

[o]ne of the strongest policies a court can have is that of determining the scope of its own judgments. [citation omitted]. It would be destructive of the basic principles of the Federal Rules of Civil Procedure to say that the effect of a judgment of a federal court was governed by the law of the state where the court sits simply because the source of federal jurisdiction is diversity. The rights and obligations of the parties are fixed by state law. These may be created, modified and enforced by the state acting through its own judicial establishment. But we think it would be strange doctrine to allow a state to nullify the judgments of federal courts constitutionally established and given power also to enforce state created rights. The Erie doctrine [citation omitted] is not applicable here....

*Kern v. Hettinger,* 303 F.2d 333, 340 (2d Cir.1962). This court is clearly in the best position to determine the scope and effect of its judgment following an eighteen month trial for reasons of judicial economy, efficiency, and maintaining the integrity of this tribunal. *See* Restatement (Second) of Judgments § 87 comment b ("Many cases have said flatly that when the federal court sits in diversity jurisdiction, the law of the state where it sits determines the res judicata effect of the federal judgment. This seems plainly wrong when it comes to the elements of finality, and the better reasoned cases have so recognized."); Wright, Miller and Cooper § 4472, at 738 ("[T]here may be settings in which preclusion rules are so closely tied to procedural interests of the second forum that federal rules are appropriate in a federal court and state rules in a state court. Once again, mutuality may afford a good illustration. Federal courts might properly follow their own views of mutuality in successive diversity actions [footnote omitted], leaving state courts free to require mutuality in their own proceedings.").

The decisional law supports such a result. In *Silcox v. United Trucking Service, Inc.,* 687 F.2d 848 (6th Cir.1982), a federal district court determined that an attorney was not entitled to recover a fee because he had been suspended from the practice of law, after having initially concluded that it had ancillary jurisdiction over the issue in dispute. The unsuccessful litigant then sought recovery of his fees in a state court, which later ruled that it (1) had jurisdiction over the dispute and (2) would not afford res judicata to the prior federal judgment.

However, the federal district court enjoined the attorney from taking any further action in pursuit of his fees in the state court action. On appeal, the Sixth Circuit held that the scope and effect of a district court judgment in a diversity action was to be determined under federal law, notwithstanding a contrary state law of res judica-

ta. *Id.* at 852 (citing *Cemer v. Marathon Oil Co.,* 583 F.2d 830, 832 (6th Cir.1978)).

Although *Silcox* can be distinguished from the facts of *Ratliff* and *Corona,* it presents more controlling authority than *McAdoo,* upon which Northwest relies. In *McAdoo,* the Sixth Circuit discounted section 86 of the Restatement (Second) of Judgments (Effect of State Court Judgment in a Subsequent Action in Federal Court), not section 87 that this court finds instructive. *See also Empire Fire & Marine Ins. Co. v. J. Transport, Inc.,* 880 F.2d 1291, 1293 n. 2 (11th Cir.1989); *In re Air Crash at Dallas/Ft. Worth Airport,* 861 F.2d 814, 816 (5th Cir.1988); *Consolidated Television Cable Serv., Inc. v. City of Frankfort,* 857 F.2d 354 (6th Cir.1988), *cert. denied,* 489 U.S. 1082, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989); *Cribbs v. Air Canada,* 810 F.2d 1529, 1535 (11th Cir.1987); *Harnett v. Billman,* 800 F.2d 1308, 1312–13 & n. 1 (4th Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987); *U.S. Indus. v. Blake Constr. Co.,* 765 F.2d 195, 204 n. 20 (D.C.Cir.1985) (strong argument that federal law should control effect of federal diversity judgments); *Cemer v. Marathon Oil Co.,* 583 F.2d 830, 831 (6th Cir.1978); *In re Bendectin Products Liability Litigation,* 732 F.Supp. 744, 746 (E.D.Mich.1990) (interpreting *Cemer* as holding that federal law governs inquiry of whether a prior federal court judgment collaterally estops the adjudication of a subsequent federal diversity action involving identical issues); *Harrison v. Celotex Corp.,* 583 F.Supp. 1497 (E.D.Tenn.1984).[12]

Accordingly, for the foregoing reasons, this court will look to federal law of issue preclusion in deciding what preclusive effect, if any, to afford a federal diversity judgment in a subsequent diversity action.

### III.

Under federal law, collateral estoppel or issue preclusion may be applied only if four criteria have been established:

---

12. In addition, cases such as *Bassey and Selesko, P.C. v. Condon,* 694 F.Supp. 327, 330 (E.D.Mich. 1988), and *Melikian v. Corradetti,* 791 F.2d 274, 277 (3rd Cir.1986), are not persuasive, in that they contain little analysis or involve rote applications of the *Erie* analysis that is criticized in the text of this order.

(1) the issue in the instant case is the same as in the prior litigation;

(2) the issue was litigated in the prior adjudication;

(3) the determination of the issue in the prior adjudication was a critical and necessary part of the judgment in that action; and

(4) the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the prior litigation.

*NLRB v. Master Slack and/or Master Trousers,* 773 F.2d 77, 81 (6th Cir.1985); *Central Transport Inc. v. Four Phase Systems, Inc.,* 936 F.2d 256 (6th Cir.1991). However, offensive collateral estoppel may be denied:

(1) when the party asserting it could have easily joined in the action upon which reliance is placed;

(2) when the party against whom it is to be applied had no incentive to defend vigorously the first action;

(3) when the second action offers procedural opportunities unavailable in the first action; and

(4) when the judgment relied on is inconsistent with other decisions.

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 328–31, 99 S.Ct. 645, 650–52, 58 L.Ed.2d 552 (1979). This list is not exhaustive. *Id.* at 331, 99 S.Ct. at 651. Northwest does not contend that the four *Master Slack* criteria have not been met because the issues of its negligence and proximate cause were fully and fairly litigated in the joint liability trial.[13]

■ However, Northwest contends that *Parklane Hosiery,* while sanctioning the application of offensive collateral estoppel by a nonparty to a prior judgment, curtailed its use. Insofar as it is relevant to this litigation, Northwest refers to the alleged command from the Supreme Court that offensive collateral estoppel could not be used in mass tort litigation. *Id.* at 330 & n. 14, 99 S.Ct. at 651 & n. 14; *see In re Bendectin Products Liability Litigation,* 749 F.2d 300, 305 & n. 11 (6th Cir.1984)

(noting Supreme Court's explicit instruction that offensive collateral estoppel is not to be applied in mass tort litigation); *accord Lynch v. Merrell National Laboratories,* 830 F.2d 1190, 1192 (1st Cir.1987).

On the other hand, Ratliff asserts that Northwest's contention is overbroad and inapplicable, reasoning that the context within which the issue in *Bendectin* arose—Fed.R.Civ.P. 23(b)(1)(A) class certification—was the distinguishing factor. Ratliff maintains that the Sixth Circuit concern was with the ability of large numbers of class member plaintiffs to "opt out" of a consolidated trial, creating a multiplicity of litigation and inconsistent results. Since (1) no issues of class certification are present, (2) none of the other Plaintiffs in this litigation submitted their respective claims to judgment, (3) only two Plaintiffs seek to apply the judgment to their cases, and (4) neither of these Plaintiffs had the option of trial against Northwest, Ratliff concludes that these cases are not "mass tort" cases.

In *Parklane Hosiery,* the Supreme Court did permit the use of offensive collateral estoppel. Noting the arguments that had been advanced for rejecting its use, the Court identified several factors to consider in applying this doctrine but established no rigid rules:

We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. [footnote omitted]. The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where ... the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Id.,* 439 U.S. at 331, 99 S.Ct. at 651. Given this broad grant of discretion, which is to be exercised in light of the mentioned factors as well as others, this court is puzzled by the broad comment of the Sixth Circuit in *Bendectin* that, "[i]n *Parklane*

---

**13.** *Parklane Hosiery* factors (2) and (4) are not at issue in the instant cases.

*Hosiery* the Supreme Court explicitly stated that offensive collateral estoppel could not be used in mass tort litigation." 749 F.2d at 305 n. 11. A close reading of *Parklane Hosiery* reveals that the Court (1) authorized the use of offensive collateral estoppel, and (2) *only mentioned, but did not broadly accept, the arguments that have been advanced against the wholesale application of offensive collateral estoppel.*

Thus, one argument against offensive estoppel "is that it *may* be unfair to a defendant." *Parklane Hosiery*, 439 U.S. at 330, 99 S.Ct. at 651 (emphasis added). One situation in which its application *might* be unfair is when

> a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. *Professor Currie argues* that offensive use of collateral estoppel should not be applied so as to allow plaintiffs 27 through 50 automatically to recover.

*Id.* at n. 14 (emphasis added). "[A]nother situation where it *might* be unfair to apply offensive estoppel is where the second action affords that defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 331, 99 S.Ct. at 651 (emphasis added).

Accordingly, this court cannot blithely accept the proposition that offensive collateral estoppel is inappropriate because *Ratliff, Corona,* and the Bystander cases are part of "mass tort litigation." This court interprets *Bendectin* as precluding the utilization of offensive estoppel in a mass tort litigation situation that would be similar to that in Professor Currie's hypothetical and in other situations in which its application would be unfair to the defendant. The contours of when offensive collateral estoppel would be unfair—even in mass tort litigation—should be developed on a case-by-case basis. Invoking the term "mass tort litigation" is meaningless without contextual analysis. The teaching of *Parklane Hosiery* is that the issue is delicate and must be handled in this manner.

### A. *Ratliff and Offensive Collateral Estoppel*

 Northwest contends that Ratliff should not obtain the benefit of the judgment in the joint liability trial because she has taken a "wait and see" approach, benefitting from the efforts of MDC but not being exposed to the risks of an adverse verdict, a tactic that has been held to bar its application. *Parklane Hosiery*, 439 U.S. at 330, 99 S.Ct. at 651; *In re Air Crash Disaster at Stapleton International Airport, Denver, Colorado on November 15, 1987*, 720 F.Supp. 1505, 1524 (D.Colo.1989).

However, Ratliff does not fit within the classic case of the "wait and see" Plaintiff. She was a party to this multidistrict litigation and was offered three options following the global settlement, none of which included a right to proceed to trial and judgment against Northwest.

Northwest also contends that the application of offensive collateral estoppel would be unfair, citing procedural opportunities unavailable in the first action that could readily cause a different result in a second trial, such as the lack of full discovery and the inability to call witnesses.

Northwest has raised these same issues as grounds for a new trial, all of which the court has rejected. Order, MDL No. 742, October 1, 1991. Although the standard that would form the basis for overturning the judgment and the standard for finding error that precludes the application of offensive collateral estoppel are not the same, *Jack Faucett Assocs., Inc. v. American Telephone and Telegraph Co.*, 744 F.2d 118, 128–29 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985), Northwest's assertions about the alleged procedural unfairness attendant to the first trial are meritless. In every case, discovery could be pursued indefinitely, more witnesses could always be called. However, like life, litigation must end at some point. In this case, Northwest engaged in substantial discovery and had the opportunity for more diligent discovery. The trial of the claims between Northwest

and MDC covered eighteen months, litigation that approached incredulous proportions in terms of time, contentiousness, paperwork, witness examinations, and rhetoric. Juxtaposed against the monolithic pretrial and trial proceedings, Northwest's claims of lack of discovery and inability to call witnesses reverberate much sound and fury but little substance. Since the court has rejected Northwest's assertions in their entirety, not just as harmless error, there is no unfairness to Northwest in permitting offensive estoppel in *Ratliff.*

### B. Corona and Offensive Collateral Estoppel

Northwest also argues that Corona should be denied the use of offensive estoppel because he could easily have joined the earlier litigation and thus became a "wait and see" Plaintiff. Northwest notes that Corona's attorney was a partner in 1988 of a law firm that filed suit on behalf of another Northwest Flight 255 passenger, *Mazade v. McDonnell Douglas Corporation,* 89–1419 (E.D.Mich. June 3, 1988). *See* Declaration of Michael H. Selter, paragraph 2. As such, and given the amount of publicity about the tragedy, Northwest maintains that Corona could and should have joined the litigation earlier instead of waiting to file suit after the start of the joint liability trial.

Even assuming Corona was a "wait and see" Plaintiff, that fact does not make a difference in the context of this litigation. Even if Corona had filed suit earlier and had been represented by the PSC, once the global settlement was announced, he would have been given the three options that Ratliff had, none of which included the right to proceed to trial and judgment against Northwest at that time. Accordingly, the court finds no unfairness in allowing Corona to assert offensive estoppel.

For the reasons expressed above, Northwest's claims of procedural deficiencies in the first trial do not mitigate against the application of offensive estoppel in this case.

### C. Bystander Plaintiffs and Offensive Collateral Estoppel

The contentions that the Bystander Plaintiffs raise in support of, and that Northwest raises against, the application of offensive collateral estoppel are identical to those issues addressed above. Accordingly, the court will apply limited offensive collateral estoppel to the Bystander cases on the issues of negligence and proximate cause.

### IV.

A final comment is needed. This court believes that (1) much of the legal wrangling over this issue in *Ratliff* and *Corona* was unnecessary, and (2) Northwest is not prejudiced by affording the judgment preclusive effect in these two cases. Northwest offered Ratliff and Corona stipulations not to contest liability in exchange for damages-only trials, which were rejected. Although speculation, one plausible reason for their rejections is trial strategy. Presumably the Plaintiffs will attempt to utilize in some form the jury's finding of willful and wanton misconduct in their presentation of damages. However, the court notes that (1) the findings of willful and wanton misconduct were rendered in the context of exceptions to Northwest's Warsaw Convention and employee pass defenses,[14] and (2) the Plaintiffs have not demonstrated any right to recover punitive or exemplary damages. *See* Order, *In re Disaster at Detroit Metropolitan Airport on August 16, 1987,* 750 F.Supp. 793, 811–12 (E.D.Mich.1989) (applying Michigan law, which does not provide for punitive damages, to conduct of Northwest). As such, the court views this present order as synonomous with the Northwest stipulation not to contest liability. By ruling that Northwest is liable to Ratliff and Corona for damages, which is the essence or end result of the stipulation and the aim of

---

**14.** Northwest contended that its liability in certain cases was limited by exculpatory language within tickets on which international passengers and off-duty Northwest employees were travel- ling. MDC contended that the exculpatory provisions did not apply if Northwest engaged in willful and wanton misconduct.

their suits, the Plaintiffs are not afforded any advantage. With full recognition that the parties have not been given an opportunity to debate the issue, it would appear to this court that the Plaintiffs should not be permitted to present findings of willful and wanton misconduct to a damage-only jury, for they are irrelevant to the issues of compensatory damages, not probative of such issues, and prejudicial to Northwest. Fed.R.Evid. 401 and 403.

A carefully crafted instruction will be given to the jurors in an effort to inform them of the context within which they will be deciding the nature and extent of the damages that the Plaintiffs and their relatives have suffered as a result of the tragedy. However, the instruction, as anticipated, would not differ because liability was decided as a result of a stipulation not to contest it or as a finding ordered by the court. Thus, on the basis of this preliminary analysis, and in the absence of any persuasive briefing to the contrary, the Plaintiffs are only entitled to compensatory damages, and only evidence, testimony, and argument as to these damages will be permitted.

Accordingly, for the above reasons, this court will (1) grant Plaintiff Corona's motion for partial summary judgment, holding that (a) as found in the jury verdict of May 8, 1991 and the Final Judgment of May 31, 1991, as amended by the Amended Final Judgment of October 1, 1991, Northwest was negligent and proximately caused the crash of Northwest Flight 255, and (b) as such, Northwest is liable to Corona for compensatory damages as they may be established at trial, (2) grant in part and deny in part Plaintiff Ratliff's motion for partial summary judgment, holding that (a) as found in the jury verdict of May 8, 1991 and the Final Judgment of May 31, 1991, as amended by the Amended Final Judgment of October 1, 1991, Northwest was negligent and proximately caused the crash of Northwest Flight 255, and (b) as such, Northwest is liable to Ratliff for compensatory damages as they may be established at trial, and (3) grant in part and deny in part the Bystander Plaintiffs' motion for partial summary judgment, holding that as found in the jury verdict of May 8, 1991 and the Final Judgment of May 31, 1991, as amended by the Amended Final Judgment of October 1, 1991, Northwest was negligent and proximately caused the crash of Northwest Flight 255.[15]

No other finding that is encompassed within the jury verdict or the October 1, 1991 Amended Final Judgment is to be afforded preclusive effect in these eight cases.[16]

IT IS SO ORDERED.

---

**15.** The bystander cases differ in kind from the passenger cases. The fact that the jury found Northwest negligent and that such negligence proximately caused the crash of Flight 255 does not ipso facto render Northwest liable to the Bystander Plaintiffs. Northwest contends that the

> Plaintiffs are entitled to recover damages from Northwest only for fright and anxiety (and any physical injuries) proximately caused by Northwest's negligent or culpable conduct. They are not entitled to recover for any emotional distress caused by viewing the aftermath of the Accident. Order of Oct. 18, 1989. Thus, in addition to showing that Northwest was liable for the Accident, the Bystander Plaintiffs must prove that their injuries are compensable under Michigan law, and that Northwest's conduct caused these damages. These latter issues were not addressed, let alone litigated, in the joint liability trial, and Northwest may not be estopped from litigating them in these cases.... Therefore, even assuming that the Bystander

Plaintiffs prevail on their motion, the ensuing trial would cover the issues of causation and the nature and extent of their allowable injuries as well as the amount of damages.

Northwest's Opposition to Bystander Plaintiffs' Motion for Partial Summary Judgment, at 1–2. These contentions are well-taken. The Bystander Plaintiffs have not demonstrated that they are entitled to judgment as a matter of law as to liability, only that Northwest was negligent and proximately caused the crash. What flows from these findings, if anything, in these cases has not been determined. Finally, the Bystander Plaintiffs have filed a motion to amend their complaints to include claims for exemplary damages. This motion will be denied, the reasons for which will be outlined in a separate order.

**16.** Other parties have filed motions on the basis of offensive collateral estoppel. These motions will be decided separately, and this Order will govern only if applicable, as to which the Court expresses no opinion.

## VERDICT FORM

We, the jury, answer the questions submitted by the Court as follows:

## I. McDONNELL DOUGLAS' CLAIMS AGAINST NORTHWEST AIRLINES

Question 1: Was the 255 flight crew negligent, as alleged by McDonnell Douglas under its Claim # 1?

Answer: Yes ___✓___ No _____

[If you answered yes to Question 1, proceed to Question 2. If you answered no to Question 1, proceed to Question 3.]

Question 2: Was the negligence of the 255 flight crew a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim # 1?

Answer: Yes ___✓___ No _____

[Proceed to Question 3.]

Question 3: Was Northwest Airlines' management negligent with regard to piloting procedures, as alleged by McDonnell Douglas under its Claim # 2?

Answer: Yes ___✓___ No _____

[If you answered yes to Question 3, proceed to Question 4. If you answered no to Question 3, proceed to Question 5.]

Question 4: Was the negligence of Northwest Airlines' management relating to piloting procedures a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim # 2?

Answer: Yes ___✓___ No _____

[Proceed to Question 5.]

Question 5: Was Northwest Airlines' management negligent with regard to its training and supervision of the 255 flight crew, as alleged by McDonnell Douglas under its Claim # 3?

Answer: Yes ___✓___ No _____

[If you answered yes to Question 5, proceed to Question 6. If you answered no to Question 5, proceed to Question 7].

Question 6: Was the negligence of Northwest Airlines' management in its training and supervision of the 255 flight crew a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim # 3?

Answer: Yes ___✓___ No _____

[Proceed to Question 7.]

Question 7: Was Northwest Airlines' management and/or its flight crew negligent by failing to comply with governmental regulations (FARs), as alleged by McDonnell Douglas under its Claim # 4?

Answer: Yes ___✓___ No _____

[If you answered yes to Question 7, proceed to Question 8. If you answered no to Question 7, proceed to Question 9.]

Question 8: Was the negligent failure to comply with governmental regulations (FARs) a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim # 4?

Answer: Yes _____ No _____

[Proceed to Question 9. However, if you answered no to Questions 1 or 2, skip Questions 9 and 10.]

Question 9: Did Northwest Airlines negligently entrust the 255 flight crew with the aircraft, as alleged by McDonnell Douglas under its Claim # 5?

Answer: Yes _____ No ___✓___

[If you answered yes to Question 9, proceed to Question 10. If you answered no to Question 9, proceed to Question 11.]

Question 10: Was the negligent entrustment a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim # 5?

Answer: Yes _____ No _____

[Proceed to Question 11.]

Question 11: Did Northwest Airlines' management and/or its flight crew engage in willful or wanton misconduct under Michigan law, as alleged by McDonnell Douglas under its Claim # 6?

Answer: Yes ___✓___ No _____

[If you answered yes to Question 11, proceed to Question 12. If you answered no to Question 11, proceed to Question 13.]

Question 12: Was the willful or wanton misconduct under Michigan law a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim # 6?

Answer: Yes ___✓___ No _____

[Proceed to Question 13.]

Question 13: Did Northwest Airlines' management and/or its flight crew engage in willful misconduct under federal law, as alleged by McDonnell Douglas under its Claim # 7?

Answer: Yes ___✓___ No _____

[If you answered yes to Question 13, proceed to Question 14. If you answered no to Question 13, proceed to Question 15.]

Question 14: Was the willful misconduct under federal law a proximate cause of the accident, as alleged by McDonnell Douglas under its Claim # 7?

Answer: Yes ___✓___ No _____

[Proceed to Question 15.]

## II. NORTHWEST AIRLINES' CLAIMS AGAINST McDONNELL DOUGLAS

Question 15: Was the aircraft defectively manufactured, as alleged by Northwest Airlines under its Claim # 1?

Answer: Yes _____ No ___✓___

[If you answered yes to Question 15, proceed to Question 16. If you answered no to Question 15, proceed to Question 17.]

Question 16: Was the defect in manufacture a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 1?

Answer: Yes _____ No _____

[Proceed to Question 17.]

Question 17: Was the aircraft defectively designed, as alleged by Northwest Airlines under its Claim # 2?

Answer: Yes _____ No ___✓___

[If you answered yes to Question 17, proceed to Question 18. If you answered no to Question 17, proceed to Question 19.]

Question 18: Was the defective design a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 2?

Answer: Yes _____ No _____

[Proceed to Question 19.]

Question 19: Was the aircraft defective because of a failure to warn, as alleged by Northwest Airlines under its Claim # 3?

Answer: Yes _____ No ___✓___

[If you answered yes to Question 19, proceed to Question 20. If you answered no to Question 19, proceed to Question 21.]

Question 20: Was this defect a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 3?

Answer: Yes _____ No _____

[Proceed to Question 21.]

Question 21: Was the aircraft negligently manufactured, as alleged by Northwest Airlines under its Claim # 4?

Answer: Yes _____ No ✓ \_\_\_\_

[If you answered yes to Question 21, proceed to Question 22. If you answered no to Question 21, proceed to Question 23.]

Question 22: Was the manufacturing negligence a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 4?

Answer: Yes _____ No _____

[Proceed to Question 23.]

Question 23: Was the aircraft negligently designed, as alleged by Northwest Airlines under its Claim # 5?

Answer: Yes _____ No ✓ \_\_\_\_

[If you answered yes to Question 23, proceed to Question 24. If you answered no to Question 23, proceed to Question 25.]

Question 24: Was the negligent design a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 5?

Answer: Yes _____ No _____

[Proceed to Question 25.]

Question 25: Did McDonnell Douglas negligently fail to warn about dangers associated with the aircraft, as alleged by Northwest Airlines under its Claim # 6?

Answer: Yes _____ No ✓ \_\_\_\_

[If you answered yes to Question 25, proceed to Question 26. If you answered no to Question 25, proceed to Question 27.]

Question 26: Was the negligent failure to warn a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 6?

Answer: Yes _____ No _____

[Proceed to Question 27.]

Question 27: Was McDonnell Douglas negligent for failing to comply with governmental regulations (FARs), as alleged by Northwest Airlines under its Claim # 7?

Answer: Yes _____ No ✓ \_\_\_\_

[If you answered yes to Question 27, proceed to Question 28. If you answered no to Question 27, proceed to Question 29.]

Question 28: Was the negligent failure to comply with governmental regulations (FARs) a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 7?

Answer: Yes _____ No _____

[Proceed to Question 29.]

Question 29: Did McDonnell Douglas make an intentional misrepresentation in its AOLs concerning the quality of the Texas Instruments' 7274–55 circuit breakers, as alleged by Northwest Airlines under its Claim # 8?

Answer: Yes _____ No ✓ \_\_\_\_

[If you answered yes to Question 29, proceed to Question 30. If you answered no to Question 29, proceed to Question 31.]

Question 30: Was this intentional misrepresentation a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 8?

Answer: Yes _____ No _____

[Proceed to Question 31.]

Question 31: Did McDonnell Douglas make a negligent misrepresentation in its AOLs concerning the quality of the Texas Instruments' 7274–55 circuit breakers, as alleged by Northwest Airlines under its Claim # 9?

Answer: Yes _____ No ___✓___

[If you answered yes to Question 31, proceed to Question 32. If you answered no to Question 31, proceed to Question 33.]

Question 32: Was this negligent misrepresentation a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 9?

Answer: Yes _____ No _____

[Proceed to Question 33.]

Question 33: Did McDonnell Douglas make an intentional misrepresentation to the Federal Aviation Administration by its statements about the operation of the Central Aural Warning System (CAWS) Fail Light, as alleged by Northwest Airlines under its Claim # 10?

Answer: Yes _____ No ___✓___

[If you answered yes to Question 33, proceed to Question 34. If you answered no to Question 33, proceed to Question 35.]

Question 34: Was this intentional misrepresentation a proximate cause of the accident, as alleged by Northwest Airlines under its Claim # 10?

Answer: Yes _____ No _____

[Proceed to Question 35.]
## III. APPORTIONMENT OF FAULT

Question 35: If, in answering these questions, you found that (1) Northwest Airlines engaged in wrongful conduct and that such conduct was a proximate cause of the accident *AND* (2) McDonnell Douglas engaged in wrongful conduct and that such conduct was a proximate cause of the accident, you must apportion the fault between Northwest Airlines and McDonnell Douglas. Using 100 percent as the total combined fault, what percentage of fault was attributable to the conduct of Northwest Airlines, and what percentage was attributable to the conduct of McDonnell Douglas?

If you did not find Northwest Airlines *AND* McDonnell Douglas responsible for (1) wrongful conduct and (2) proximate cause of the accident, write Not Applicable (N/A) in each of the spaces provided below.

Answer: Northwest Airlines___100___ %

McDonnell Douglas___0___ %

TOTAL 100 %

In signing my name to this verdict form, I, in my capacity as foreperson, represent that the answers to the questions on pages 1–9 reflect the unanimous decisions of the jury in the above-entitled litigation.

Date: 5/8/91 _____
 [Signature]
 Foreperson

## ATTACHMENT B

### FINAL JUDGMENT ON CLAIMS BE-TWEEN NORTHWEST AIRLINES AND MCDONNELL DOUGLAS

The issues in controversy between Northwest Airlines, Inc. (Northwest) and McDonnell Douglas Corporation (MDC) in this cause were presented to a jury, Chief Judge Julian Abele Cook, Jr., presiding, during a trial which began on October 31, 1989, and ended on April 4, 1991. Approximately six weeks later, the jury, having reviewed the evidence, rendered its verdict on May 8, 1991 in open court.

On the basis of this verdict, as well as prior Orders, the Court enters the following judicial determinations in this cause:

1. A judgment is entered in favor of MDC and against Northwest regarding MDC's claims 1, 2, 3, 4, 6, and 7 against Northwest, as identified in the jury instructions and in the verdict form.

2. A judgment is entered in favor of Northwest and against MDC relating to MDC's claim 5 against Northwest, as expressed in the jury instructions and in the verdict form.

3. A judgment is entered in favor of MDC and against Northwest pertaining to Northwest's claims 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 against MDC, as set forth in the jury instructions and in the verdict form.

4. A judgment is entered in favor of Northwest and against MDC with respect to all claims brought by MDC against Northwest during this cause that were not submitted to the jury because they were dismissed by prior Orders of this Court.

5. A judgment is entered in favor of MDC and against Northwest with respect to all claims brought by Northwest against MDC during this cause that were not submitted to the jury because they were dismissed by prior Orders of this Court.

6. MDC shall recover from Northwest such sums as are, or will be, due and owing under law, and

7. Northwest shall take nothing and its claims against MDC are dismissed on the merits.

Under Federal Rule of Civil Procedure 54(b), this Court makes the express determination that there is no just reason for the delay of a final judgment in these claims. The Clerk is directed to enter a final judgment as to these claims pursuant to Federal Rule of Civil Procedure 79(a).

IT IS SO ORDERED.

/s/Julian Abele Cook, Jr.
Julian Abele Cook, Jr.
Chief Judge
United States District Court

(s) Carolyn Onumonu

Carolyn Onumonu

Deputy Court Clerk

May 31, 1991.

Detroit, Michigan.

---

## ATTACHMENT C

### AMENDED FINAL JUDGMENT ON CLAIMS BETWEEN NORTHWEST AIRLINES AND MCDONNELL DOUGLAS

The issues in controversy between Northwest Airlines, Inc. (Northwest) and McDonnell Douglas Corporation (MDC) in this cause were presented to a jury, Chief Judge Julian Abele Cook, Jr., presiding, during a trial which began on October 31, 1989 and ended on April 4, 1991. Approximately six weeks later, the jury, having reviewed the evidence, rendered its verdict on May 8, 1991 in open court.

On the basis of this verdict, as well as prior Orders, the Court enters the following judicial determinations in this cause:

1. A judgment is entered in favor of MDC and against Northwest regarding MDC's claims 1, 2, 3, 4, 6, and 7 against Northwest, as identified in the jury instructions and in the verdict form.

2. A judgment is entered in favor of Northwest and against MDC relating to MDC's claim 5 against Northwest, as expressed in the jury instructions and in the verdict form.

3. A judgment is entered in favor of MDC and against Northwest pertaining to Northwest's claims 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 against MDC, as set forth in the jury instructions and in the verdict form.

4. A judgment is entered in favor of Northwest and against MDC with respect to all claims brought by MDC against Northwest during this cause that were not submitted to the jury because they were dismissed by prior Orders of this Court.

5. A judgment is entered in favor of MDC and against Northwest with respect to all claims brought by Northwest against MDC during this cause that were not submitted to the jury because they were dismissed by prior Orders of this Court.

6. MDC shall recover from Northwest such sums as are, or will be, due and owing under law. The determination of what sums, if any, are due and owing with regard to the Special Defense cases will be deferred pending further proceedings, Order, October 1, 1991, and

7. Northwest shall take nothing and its claims against MDC are dismissed on the merits.

Under Federal Rule of Civil Procedure 54(b), this Court makes the express determination that there is no just reason for the delay of a final judgment in these claims. The Clerk is directed to enter a final judgment as to these claims pursuant to Federal Rule of Civil Procedure 79(a).

IT IS SO ORDERED.

/s/Julian Abele Cook
JULIAN ABELE COOK, JR.
Chief Judge
United States District Court

(s)Carolyn Onumonu

Carolyn Onumonu

Deputy Court Clerk

October 1, 1991.

Detroit, Michigan.